The First National Bank of Quincy, Illinois,

*v.*

Henry F. J. Ricker.

1. Forged check — *rights and liability of bank in paying the same.* The drawee of a bank check is presumed to know the signature of the drawer, and if the drawee pays a forged check to the holder, he will not be entitled to recover back the money so paid, where there has been no fraud practiced upon him.

2. This doctrine proceeds on the ground that the loss has arisen through some neglect or default, and the presumption being that the drawee knows the handwriting of the drawer, if he pays a forged check, it is presumed to be through some carelessness on his part, and the law imposes the loss on him.

3. The drawee, or payor, of a forged bank check can recover back the amount paid by him on it, where the holder, or payee, is himself at fault, or has been guilty of fraudulent practices which may have thrown the drawee off his guard.

4. Where the holder of a forged check, which he had received and paid for without knowing that it was a forgery, after acquiring knowledge of facts calculated to arouse suspicion that it was such, presented it at the bank on which it was drawn, and demanded payment, without disclosing such facts, and was told by the teller of the bank that he did not certainly know the signature to the check, and would only pay it on con-

dition that the holder would indorse it, and thereupon the holder did indorse it, and receive the money thereon, and the bank, within a few hours, discovered the forgery, and demanded that the money be refunded, it was *held*, that the drawee could recover the money thus paid.

5. Estoppel—*party insisting on, must have acted in good faith.* An estoppel arising out of a presumption, in pursuance of legal obligation, as understood in commercial law, concerns conscience and equity, and the party who would avail of it must himself have acted in good faith toward the party on whose conduct he relies, or it will constitute no bar to the assertion of the truth.

6. Where the holder of a forged check presented it to the drawee, and received payment on it, and withheld knowledge which he then possessed of facts which rendered it morally certain that the check was a forgery, he is not in a position to set up, in a suit brought to recover back the money, that the drawee was obliged to know the signature of his own depositors, and that he is estopped to say that he was mistaken.

Appeal from the Circuit Court of Adams county; the Hon. Joseph Sibley, Judge, presiding.

Messrs. Skinner & Marsh, for the appellant.

Messrs. Wheat & Marcy, for the appellee.

Mr. Justice Scott delivered the opinion of the Court:

The cases are numerous that decide the drawee must be presumed to know his correspondent's signature. In case he makes payment to an innocent holder for value, he is concluded by the act, notwithstanding the bill may turn out to be a forgery. If he accepts a bill, he must pay it, and if he has paid it in the usual course of business, he can not recover the money back from the payee, or holder. *Price* v. *Neale,* 3 Burr. 1354; *Wilson* v. *Alexander,* 3 Scam. 392; *Hoffman* v. *Bank of Milwaukee,* 12 Wall. 181; *Bank of U. S.* v. *Bank of Georgia,* 10 Wheaton, 348.

The same principle, for still more politic reasons, has been held to apply to bankers in the payment of bank notes and checks. Bankers are supposed to have a better opportunity to know the signatures of their depositors to checks than a

drawee that of a single correspondent, whose bills are drawn with less frequency, and are, perhaps, held to a higher degree of diligence in that regard.

The principles applicable to checks and to bills are regarded as sufficiently analogous to make a decision rendered upon one instrument a precedent for a case arising on the other.    Hence, we find the case of *Price* v. *Neale* is referred to in nearly or quite all the decisions on this question.

That was an action to recover back money paid on two forged bills.    It was declared the plaintiff could not recover, for the reason the defendant had received the money on the bills indorsed to him for a valuable consideration without any suspicion of forgery, and that it was incumbent on the plaintiff to be satisfied the bill drawn on him was in the drawer's hand, before he accepted or paid it, but it was not incumbent on the defendant to inquire into it.

The doctrine of this case, so far as it holds the drawee is bound to know the handwriting of his correspondent, when applied to the case of a bill accepted or paid by him, where the drawer's name has been forged, has seldom, if ever, been departed from.    It is said to have its foundation in a sound public policy, and considerations of convenience in commercial transactions make it imperative it shall be enforced.

The general rule, no doubt, has its exceptional cases, and the doctrine as stated by Lord MANSFIELD, in *Price* v. *Neale*, has certainly been very much limited by more modern decisions.    The difficulty does not lie in the general rule itself, for it is undoubtedly supported by reason and the weight of authority, but in its application to particular cases.

It will, perhaps, afford a clearer understanding of the points in controversy if we give a brief history of the case at bar, as made by the evidence.

On the morning of the 24th of June, 1873, Hundrack & Co. deposited with the appellant bank three checks, purporting to be drawn in their favor by business firms of the city. Among them was the check in controversy, purporting to be

signed by Manning Bros., and drawn upon appellee. The party making the deposit immediately drew out nearly the entire deposit. This transaction occurred after the hour of 10 o'clock, at which hour the exchanges of checks between the several banks are usually made.

On the same day, and about the same hour, Hundrack deposited a number of checks in the Union Bank, and in like manner drew out the largest portion. Among the checks deposited with the Union Bank was one of Bagby & Wood. About 11 o'clock of that day, it was presented at the appellant bank to ascertain if it was all right, when the clerk was told there were no funds there, but probably would be by 3 o'clock. In the afternoon, the attention of Wood was called to this check, and it was, upon inquiry, found to be a forgery.

In the usual course of business, checks of other banks received after 10 o'clock would be retained until that hour the next day, when the checks would be exchanged and the balances paid. When it was discovered the checks of Bagby & Wood were forgeries, there was some uneasiness manifested among the officers of the appellant bank and those of the Union Bank in regard to these and other checks that had been deposited by Hundrack. The Union Bank had also taken from Hundrack & Co. a check of Manning Bros. on appellee's bank. Both parties were anxious to know whether the checks they had taken were genuine. On sending them to appellee's bank shortly before 3 o'clock, they were promptly paid.

There is a direct contradiction in the evidence as to what passed between the witness Mills and the teller of appellee's bank, when the former presented Manning Bros.' check, the one in controversy, for payment. It is certain, Mills did not communicate the suspicions that had been aroused on learning the Bagby & Wood checks were forgeries; that the checks of Schermerhorn Bros. & Co. drawn on the Union Bank were probably forgeries, and that T. S. Hundrack, who had made the several deposits in the name of Hundrack & Co., and

who alone constituted that fictitious firm, had fled the city. All these facts were within the knowledge of some of the principal bank officers before Mills was sent to appellee's bank with the check.

The signature to the check purported to be in the hand-writing of August Manning. The brother, who usually signed the checks, is Antoine. The proof shows August signed but few checks, and hence the bank's officers were not, in fact, very familiar with his signature. It was an adroit contrivance on the part of the forger to avoid detection, for it is proven August was temporarily absent from the city on that day.

The teller of appellee's bank testifies he first saw the check in the morning; that it was presented by a man who represented himself to be Hundrack, but he did not know him. He declined to pay it then, because he had doubts about the signature. When Mills presented it in the afternoon to get it certified, he says he told him he was not acquainted with the signature, but supposed it was the signature of one of the Manning Bros., with which he was not acquainted, but if he would indorse the check, he would pay him the money. Mills then indorsed it for appellant, and the teller paid him the money. He returned and told the cashier of the appellant bank what he had done—that he had indorsed the check and got the money. The reply was, " It is all right."

Mills denies, however, much of this conversation with the teller, but admits he indorsed it because it was the custom among banks to stamp or indorse checks payable to order. He further admits, the teller said to him, "You indorse it, and I will pay you the money," to which he replied : " I said to him, I did not know whether I was authorized to indorse it, but I would do so ; and I indorsed it, and he paid me the money."

Appellee soon discovered the checks were forgeries, and the same afternoon, within a few hours, offered to return the one in controversy to appellant, and demanded the money

paid on it, which was refused. It clearly appears the forger had fled before the checks were presented for payment.

The principle that lies at the foundation of all the cases on this subject, and which is said to preclude a recovery, is, that the drawee is presumed to know the signature of the drawer. Having accepted or paid the bill, he is estopped, on considerations of public policy, from denying that which it was his duty to know. The law will not permit him to allege he was mistaken, when no fraud has been practiced upon him. The doctrine proceeds on the ground the loss has arisen through some neglect or default, and the presumption being the drawee knows his correspondent's handwriting, if he pays or accepts a forged bill, it will be presumed it was through some carelessness on his part, and the law will impose the loss on him.

The rule, however, presupposes the good faith of the transaction, that the holder was a purchaser *bona fide* for a valuable consideration, for the law certainly is, the drawee or payor can recover where the payee or holder is himself at fault, or has been guilty of fraudulent practices which may have thrown him off his guard. The reason assigned for the decision in *Price* v. *Neale,* is, that the defendant had received the bills for "a fair and valuable consideration, which he had *bona fide* paid, without the least privacy or suspicion. Here was no fraud, no wrong." Great stress is laid on the fact "the plaintiff lies by for a considerable time after he had paid these bills, and then finds out that they were forged, and the forger comes to be hanged."

The reasoning of this case seems to have been adopted in nearly all the cases on this subject, with more or less distinctness. Hence we discover, in very many of the cases where it has been held the drawee can not recover back money inadvertently paid on a forged bill or check, that one element of defense was in not giving prompt notice to the payee or holder, the instrument was a forgery. The tendency of all modern decisions seems to be, that, where there has been an

unreasonable delay in discovering the forgery, and giving notice, it will, in every instance, bar a recovery by the payor.

It will be observed, from a consideration of the evidence in the case at bar, there is almost a total absence of those facts upon which the decisions have been rested, that hold the payor can not recover back money paid by mistake on a forged bill. There was no unreasonable delay in giving notice the check was a forgery. It was given in a few hours after the payment was made. The forger had fled before the check was presented, and hence it can not be said the delay worked any injury to appellant, or prevented the bank from securing itself, or that the payment, if retracted, made its condition any worse than if appellee had refused payment in the first instance. But more important than all, there is wanting in this case that element of good faith that is to be found in nearly all the adjudged cases where a recovery has been denied.

It is doubtless true, the appellant bank received the check in the usual course of business, of Hundrack, without any suspicion it was a forgery. But when it was presented for payment, the bank officers had every reason to believe it was spurious, and that the forger had absconded. They knew Bagby & Wood's checks were forgeries. No actual knowledge had then been obtained the Manning Bros.' checks were forgeries, but they had such information as gave ground for such belief, and would put any prudent man on his guard. Without imparting the information in their possession, the check was presented at appellee's bank, not, perhaps, for payment, but for certification.

There is testimony to the effect, and the jury had the right to give credence to it, that the teller of appellee's bank told appellant's clerk he did not certainly know the signature to the check, but would only pay it on condition it was indorsed by appellant, which was done. It is hardly probable the check would have been paid but for the indorsement. No one can believe appellee would have paid the check, had his teller been

put in possession of the facts then known to the officers of the appellant bank or the Union Bank. The cashier was in possession of such facts as made it morally certain at least that it was a forgery, before he sent the check to appellee's bank for certification. This information was withheld. Was this good faith ? These facts rendered it "against conscience," to use the terse language of Lord MANSFIELD, in *Price* v. *Neale*, for appellant to retain appellee's money.

It is sought to bar a recovery, for the reason it is said appellee is estopped to deny he knew the signature of his own depositor.

The defense is not rested so much on the ground of an *estoppel in pais* as upon an *estoppel* arising out of a presumption in pursuance of legal obligation, as understood in commercial law. Such an estoppel is of vastly less significance than one created by deliberate acts of the party which it would be inequitable for him to retract. The doctrine of estoppel insisted upon, as was said in *Hefner* v. *Vandolah*, 57 Ill. 520, concerns conscience and equity, and the party who would avail of it, must himself have acted in good faith toward the party on whose conduct he relied, or it will constitute no bar to the assertion of the truth. We conceive this to be pre-eminently a case where this most equitable principle would find its most appropriate application. Appellant claims it relied on the obligation of appellee to know the signature of his own depositor, and insists he is estopped, by reason of this legal presumption that prevails in banking and commercial transactions, to say he was mistaken. But did the officers of the appellant bank act in good faith toward appellee in withholding the knowledge of those facts they possessed ? This guilty conduct induced the very action the bank relies upon as an estoppel, and it seems to us it would be most inequitable it should prevail as a defense.

It is contended there is no duty resting on the innocent holder of a check, on presenting it for payment, to communicate to the bank suspicions he may have as to its spurious

character, if at the time he took it he had no reason to suspect it was a forgery. The cases of *The Bank of St. Albans* v. *The Farmers' Bank*, 10 Ver. 141, and *Ward* v. *Allen*, 2 Met. 53, are cited in support of this proposition.

We have looked into those cases, but we do not think they sustain the doctrine to the extent asserted. While we have the highest respect for the courts that rendered those decisions, we must be permitted to express our dissent from the principle insisted upon. as being unsound in law and in good conduct. No warrant can be found for its introduction in the exigencies of banking or commercial transactions. Such a doctrine, in our opinion, would tend rather to debase than maintain commercial integrity.

Where exceptional circumstances and excusing facts are made clearly to appear, courts have permitted a recovery, and in some instances very slight palliating circumstances have been declared sufficient. The case of *Wilkinson* v. *Johnson*, 3 B. & C. 428, is a well reasoned case on this point.

The case of *Goddard* v. *The Merchants' Bank*, 4 Comst. 147, is a still stronger case illustrative of the exceptions to the general rule. In that case. the plaintiffs were informed a draft had been drawn by their correspondent, a bank in Ohio, on the American Exchange Bank, at New York, which had been protested, and was then in the hands of the notary. The plaintiff called to see the notary about taking up the draft, but, owing to his absence, did not see the draft. On this information the plaintiff acted, and supposing his correspondent (the Canal Bank) had, by mistake, drawn on the Exchange Bank, with which it had just before kept an account, instead of drawing on the plaintiffs, and wishing to protect the credit of the drawers, he left a check with a party in the office, to be delivered to the notary, to take up the draft, and gave directions to have it sent to his office that day. The notary took the check and paid the money to the defendants, but failed to send the draft as requested. When the plaintiff called the next day on the notary, for the draft, on its production he

immediately pronounced it a forgery, and thereupon went to the defendant's bank and demanded the money back. On this state of facts, the plaintiffs were permitted to recover, on the ground they were guilty of no negligence, as the notary, when he received the check, and handed it over to the defendants, both he and they tacitly affirmed the draft was genuine.

In *McKleroy* v. *Southern Bank of Kentucky*, 14 Lou. Ann. R. 458, while admitting the full force of the general rule, it was, nevertheless, ruled, where a party becomes the holder of a forged draft before it had been accepted, and the loss had already attached before payment by the acceptors, who, immediately on ascertaining the spurious character of the paper, gave notice to the holders, such a case was an exception to the general rule, and the acceptors were not estopped from proving the forgery and recovering the money back.

The principle upon which the case is decided is, the holder had suffered no loss, it having already occurred, and he ought not to be permitted to profit by the mere accident of payment.

In the case at bar, the accident of payment was produced, if the testimony of the teller of appellee's bank is to be believed, by the act of appellant's clerk indorsing the check. Payment had been refused in the morning, on the ground the teller had doubts as to the signature. While it is not claimed a recovery can be had under the present declaration on the indorsement, it is a fact that tends to show appellee was guilty of no negligence in paying the check. The fact of the indorsement induced appellee to waive his doubts as to the genuineness of the signature of his depositor, which he would not otherwise have done. These facts bring the case at bar clearly within the principle of the decision in *Goddard* v. *The Merchants' Bank, supra*.

The instructions given were substantially correct, and were such as the nature of the case required. Upon the whole record, we are satisfied the verdict was warranted by the law and the evidence. The judgment must therefore be affirmed.

*Judgment affirmed.*

Mr. JUSTICE WALKER: I am unable to find that the First National Bank had such information as indicated bad faith in receiving the money on the check. They did not know it was a forgery, and had a right to suppose that Ricker would know whether it was genuine, and so sent to learn that fact, and, I think, were not required to disclose what they had heard in reference to the Bagby & Wood check.