HOFFMAN & CO. v. BANK OF MILWAUKEE.

A consignor who had been in the habit of drawing bills of exchange on his consignee with bills of lading attached to the drafts drawn (it being part of the agreement between the parties that such bills should always attend the drafts), drew bills on him with forged bills of lading attached to the drafts, and had the drafts with the forged bills of lading so attached discounted in the ordinary course of business by a bank ignorant of the fraud. The consignee, not knowing of the forgery of the bills of lading, paid the drafts. *Held*, that there was no recourse by the consignee against the bank.

ERROR to the Circuit Court for the District of Wisconsin; the case being thus:

Chapin & Miles, a forwarding and commission firm in Milwaukee, were engaged in moving produce to Hoffman & Co., of Philadelphia, for sale there. The course of their business was thus: They first shipped the produce, obtaining a bill of lading therefor, to which they attached a draft drawn by them on their consignee for about the value of the grain, and then negotiated the draft with bill of lading attached, to some bank in Milwaukee, and obtained the money.

It was understood that the draft was drawn upon the credit of the property called for by the bill of lading, and would be paid by the consignee upon receipt of the bill of lading; and—with perhaps a single exception where the bills of lading, not being obtained during bank hours, was sent otherwise than with the draft—the drafts were accompanied by such bills. The Philadelphia firm, however, rarely knew what flour belonged to any particular bill of lading; not being obliged by the railroad clerks at Philadelphia, where they were known, to exhibit any bill of lading in order to get the flour, and their custom being, on getting notice from the railroad office that flour had arrived for them, to pay the charges, give receipts, and send their drayman for it, and bring it away. It was the practice of the Milwaukee firm to advise their Philadelphia correspondents by letter of shipments made and drafts drawn, which advisements were acknowledged with a promise "to honor *the drafts.*" When flour was "slow" in going forward they corresponded with the Milwaukee house about it, but did not on that account refuse acceptance or payment of any bill.

Having been thus dealing for about sixteen months, Chapin & Miles drew three drafts on Hoffman & Co., in the ordinary way, and attaching to them bills of lading which they had forged, negotiated, in the ordinary course of business, the drafts, with the forged bills of lading attached, to the City Bank of Milwaukee, getting the money for them. The bank knew nothing of the forgery of the bills of lading. The ordinary correspondence between the two houses took place. That in regard to one draft will exhibit its character.

"MILWAUKEE, February 26th, 1869.

"MESSRS. HOFFMAN & CO., PHILADELPHIA.

"DEAR SIRS: We ship to you to-day 200 bbls. 'Prairie Flour,' and draw at s't for $1100, which please honor. Will draw for $5 only when we can, but must crowd $5½ part of the time.

"Yours, truly,
"CHAPIN & MILES."

"PHILADELPHIA, March 2d, 1869.
"MESSRS. CHAPIN & MILES.

"GENTLEMEN: Yours 26th ult. here.   Your *draft* $1100, *will be paid*, but we think you should try to keep them down to $5 per barrel.   We advise sale of 100 Prairie, at $7, and 54, at $7.25.

"Yours, respectfully,

"HOFFMAN & CO."

No flour was forwarded.   The Milwaukee bank forwarded the drafts, however, with the forged bills of lading attached, to their correspondent, the Park Bank in New York, for collection.   The Park Bank forwarded the same to its correspondent, the Commonwealth Bank of Philadelphia, for the same purpose, and the latter bank presented the draft and bill of lading to the drawees, Hoffman & Co., who, knowing the drafts to be genuine, and not supposing that the bills of lading were otherwise, paid the drafts to the Philadelphia bank, which remitted the money back to the Park Bank to the credit of the Bank of Milwaukee.

No flour coming forward, Hoffman & Co. discovered that the bills of lading were forged, and Miles & Chapin being insolvent, they sued the Bank of Milwaukee to recover the amount paid, as above stated.

The declaration in the case contained the common counts in assumpsit, with a notice attached to the defendant, "that the action was brought to recover $3100, money paid by the plaintiff, under mistake of fact, upon drafts and bills of lading (of which copies were annexed), the mistake being that the plaintiffs paid the money upon the belief that the said bills of lading were genuine instruments; whereas, in fact, they were forged; the amount of money paid being the amount called for by the drafts, which was paid upon the credit and inducement of the bills of lading."

Neither the name of the defendant, the Milwaukee bank, nor of any of its officers or agents, appeared in or upon the bills of lading in question, and had it not been for extrinsic evidence, it could not have been told from those bills that the bank had had anything to do with them.   Nor had the bank

had any dealings or correspondence of any kind with the Philadelphia house, relative to the shipments of flour by Chapin & Miles, or relative to the drafts drawn by them.

On this case the court below directed the jury to find for the bank, defendant in the case, and the plaintiffs brought the case here.

*Mr. M. H. Carpenter, for the plaintiff in error :*

The case is this : The defendants are owners of certain drafts drawn upon the plaintiffs, which the defendants know the plaintiffs will not pay unless accompanied with bills of lading, which will authorize the plaintiffs to receive the flour, upon the faith and security of which the drafts are drawn. And knowing this, the defendant presents said drafts to the plaintiffs, accompanied by forged bills of lading; and the plaintiffs, believing the bills of lading to be genuine, pay the money to the defendant. Had the plaintiffs known the real facts of the case they would not have accepted and paid the drafts, and could not have been compelled to do so, and the loss would have fallen on the defendants. The plaintiffs paid the drafts to the defendant because they did not know the facts; in other words, under a mistake. The money of the plaintiffs has therefore got into the pocket of the defendant without consideration; both the plaintiffs in paying and the defendant in receiving the money being mutually mistaken about the fact which was the inducement for the plaintiffs to pay the money. Money so paid can be recovered.*

We fully concede the rule that the acceptor of a draft is bound to know the signature of the person drawing or indorsing it. But the rule is confined to the signature of mercantile paper; and this payment was made not on the credit of the draft, but on the credit of the bills of lading. It was part of the agreement between the forwarders and the consignees, that bills of lading should always accompany

---

* Hudson *v.* Robinson, 4 Maule & Selwyn, 478; Ellis & Morton *v.* Ohio Life and Trust Company, 4 Ohio State, 628.

the drafts; genuine bills, of course, not forged ones.  The Milwaukee bank being an indorser of the draft which carried the bill of lading with it, should be held to have guaranteed the genuineness of the bill.

In *Bank of Commerce* v. *Union Bank*,[*] it was held that the acceptor of a draft which was forged, *not as to the signature of the drawer*, but by an alteration in *the body of the draft*, might recover back the money, as money paid under a mistake. The court distinguishing the case from that of the forgery of the drawer's signature, which the acceptor is presumed to know, say: "The greater negligence in a case of this kind is chargeable on the party who received the bill from the perpetrator of the forgery.  So far as respects the genuineness of the bill each indorser receives it on the credit of the previous indorsers," &c.

This language is particularly applicable to the facts of this case; for these forged bills of lading purported to be executed in Milwaukee, where the defendant had its banking office, and where its officers could have informed themselves as to the genuineness of the instruments by a few minutes' walk.  The plaintiffs resided and did business in Philadelphia, and received the instruments on the faith of approbation by the defendant.

*Mr. J. W. Cary, contra:*

We concede that money paid by mistake may, in many cases, be recovered back, but it is settled that money paid by the drawee of a forged bill of exchange to an innocent holder for value, cannot be so recovered, because the drawee is presumed to know his drawer's signature.  This exception is "fully conceded" by the other side.  Their argument is obliged, therefore, to proceed on an assumption of facts not true; to assume that this payment was not a payment of drafts, but a payment on flour shipped.  This is a radical defect of the argument, and pervades it throughout.  The assumption is in the face of the facts.  These show that Hoffman & Co. paid drafts, relying on their general business

---

[*] 3 Comstock, 230; and see Goddard v. Bank, 4 Id. 147.

arrangement with Chapin & Miles rather than on a receipt of the very flour mentioned in any specific bill of lading. In this particular case it is specifically "the draft" which they promise to pay.

The bill of lading is not in any way indorsed by the Milwaukee bank. No representation of any sort was made by that bank about anything to Hoffman & Co. The transaction was wholly between Miles & Chapin and Hoffman & Co., and in pursuance of their general agreement. The bills, which were *not* forgeries,—though the case would not be changed if they had been—were discounted in ordinary course, forwarded for collection, and paid on demand. That concludes the thing. That the "collateral" was worthless don't change the case. The bank's title to the drafts being unquestioned, no defence was available to the acceptor after payment of them.

These positions do not rest on argument merely. The case of *Craig* v. *Sibbett & Jones*,* where the judgment of the Supreme Court of Pennsylvania is given, in a luminous opinion by Gibson, C. J., is in point. So too the English case of *Robinson* v. *Reynolds*† covers this. After such precedents there would be an end of the question if the case were not plainly within old rules, which it is.

Mr. Justice CLIFFORD delivered the opinion of the court.

Acceptors of a bill of exchange, by the act of acceptance, admit the genuineness of the signatures of the drawers, and the competency of the drawers to assume that responsibility. Such an act imports an engagement, on the part of the acceptor, to the payee or other lawful holder of the bill, to pay the same, if duly presented, when it becomes due, according to the tenor of the acceptance. He engages to pay the holder, whether payee or indorsee, the full amount of the bill at maturity, and if he does not, the holder has a right of action against him, and he may also have one against the drawer. Drawers of bills of exchange, however, are not

---

* 15 Pennsylvania, 238.          † 2 Adolphus & Ellis, N. S. 196.

liable to the holder, under such circumstances, until it appears that the bill was duly presented, and that the acceptor refused or neglected to pay the same according to the tenor of the instrument, as their liability is contingent and subject to those conditions precedent.

Three bills of exchange, as exhibited in the record, were drawn by Chapin, Miles & Co., payable to the order of the defendants, and the record shows that they, the defendants, received and discounted the three bills at the request of the drawers. Attached to each bill of exchange was a bill of lading for two hundred barrels of flour, shipped, as therein represented, by the drawers of the bills of exchange, and consigned to the plaintiffs; and the record also shows that the drawers, in each case, sent a letter of advice to the consignees apprising them of the shipment, and that they would draw on them as such consignees for the respective amounts specified in the several bills of exchange. Prompt reply in each case was communicated by the plaintiffs, acknowledging the receipt of the letter of advice sent by the shippers, and promising to honor the bills of exchange, as therein requested. Evidence was also introduced by the plaintiffs showing that the defendants indorsed the bills of exchange and forwarded the same, with the bills of lading attached, to the National Park Bank of the city of New York, their regular correspondent; that the same were subsequently indorsed by the latter bank, and forwarded to the Commonwealth Bank of Philadelphia for collection; that the Commonwealth Bank presented the bills of exchange, with the bills of lading attached, to the plaintiffs, as the acceptors, and that they paid the respective amounts as they had previously promised to do, and that the Commonwealth Bank remitted the proceeds in each case to the National Park Bank, where the respective amounts were credited to the defendants. Proof was also introduced by the plaintiffs showing that each of the bills of lading was a forgery, and that the plaintiffs, before the commencement of the suit, tendered the same and the bills of exchange to the defend-

ants, and that they demanded of the defendants, at the same time, the respective amounts so paid by them to the Commonwealth Bank. Payment as demanded being refused, the plaintiffs brought an action of assumpsit against the defendants for money had and received, claiming to recover back the several amounts so paid as money paid by mistake, but the verdict and judgment were for the defendants, and the plaintiffs sued out a writ of error, and removed the cause into this court. Testimony was also introduced by the defendants tending to show that the shippers were millers; that they made an arrangement with the plaintiffs to ship flour to them at Philadelphia for sale in that market, the plaintiffs agreeing that they, the shippers, might draw on them for advances on the flour, to be reimbursed out of the proceeds of the sales; that for more than a year they had been in the habit of shipping flour to the plaintiffs under that arrangement and of negotiating drafts on the plaintiffs to the banks in that city, accompanied by bills of lading in form like those given in evidence in this case; that the drafts, with the bills of lading attached, were sent forward by the banks, where the same were discounted, and that the same were paid by the plaintiffs; that the drawers of the drafts in every case notified the plaintiffs of the same, and that the plaintiffs, as in this case, answered the letter of advice and promised to pay the amount. They also proved that the drawers of the drafts in this case informed their cashier that the same would always be drawn upon property, and that the bills of lading would accompany the drafts, and that they had no knowledge or intimation that the bills of lading were not genuine. Instructions were requested by the plaintiffs, that if the jury found that the respective bills of lading were not genuine, that they were entitled to recover the several amounts paid to the Commonwealth Bank, with interest; but the court refused to give the instruction as prayed, and instructed the jury that if they found the facts as shown by the defendants, the plaintiffs could not recover in the case, even though they should find that the several bills of lading were a forgery.

Money paid under a mistake of facts, it is said, may be recovered back as having been paid without consideration, but the decisive answer to that suggestion, as applied to the case before the court, is that money paid, as in this case, by the acceptor of a bill of exchange to the payee of the same, or to a subsequent indorsee, in discharge of his legal obligation as such, is not a payment by mistake nor without consideration, unless it be shown that the instrument was fraudulent in its inception, or that the consideration was illegal, or that the facts and circumstances which impeach the transaction, as between the acceptor and the drawer, were known to the payee or subsequent indorsee at the time he became the holder of the instrument.*

Such an instrument, as between the payee and the acceptor, imports a sufficient consideration, and in a suit by the former against the latter the defence of prior equities, as between the acceptor and the drawer, is not open unless it be shown that the payee, at the time he became the holder of the instrument, had knowledge of those facts and circumstances.

Attempt is made in argument to show that the plaintiffs accepted the bills of exchange upon the faith and security of the bills of lading attached to the same at the time the bills of exchange were discounted by the defendants. Suppose it was so, which is not satisfactorily proved, still it is not perceived that the concession, if made, would benefit the plaintiffs, as the bills of exchange are in the usual form and contain no reference whatever to the bills of lading, and it is not pretended that the defendants had any knowledge or intimation that the bills of lading were not genuine, nor is it pretended that they made any representation upon the subject to induce the plaintiffs to contract any such liability. They received the bills of exchange in the usual course of their business as a bank of discount and paid the full amount of the net proceeds of the same to the drawers, and it is not

---

* Fitch v. Jones, 5 Ellis & Blackburn, 238; Arbouin v. Anderson, 1 Adolphus & Ellis, N. S. 498; Smith v. Braine, 16 Id., N. S. 244; Hall v. Featherstone, 3 Hurlstone & Norman, 287.

even suggested that any act of the defendants, except the indorsement of the bills of exchange in the usual course of their business, operated to the prejudice of the plaintiffs or prevented them from making an earlier discovery of the true character of the transaction. On the contrary, it distinctly appears that the drawers of the bills of exchange were the regular correspondents of the plaintiffs, and that they became the acceptors of the bills of exchange at the request of the drawers of the same and upon their representations that the flour mentioned in the bills of lading had been shipped to their firm for sale under the arrangement before described.

Beyond doubt the bills of lading gave some credit to the bills of exchange beyond what was created by the pecuniary standing of the parties to the same, but it is clear that they are not a part of those instruments nor are they referred to either in the body of the bills or in the acceptance, and they cannot be regarded in any more favorable light for the plaintiffs than as collateral security accompanying the bills of exchange.

Sent forward, as the bills of lading were, with the bills of exchange, it is beyond question that the property in the same passed to the acceptors when they paid the several amounts therein specified, as the lien, if any, in favor of the defendants was then displaced and the plaintiffs became entitled to the instruments as the muniments of title to the flour shipped to them for sale and as security for the money which they had advanced under the arrangement between them and the drawers of the bills of exchange. Proof, therefore, that the bills of lading were forgeries could not operate to discharge the liability of the plaintiffs, as acceptors, to pay the amounts to the payees or their indorsees, as the payees were innocent holders, having paid value for the same in the usual course of business.*

Different rules apply between the immediate parties to a bill of exchange—as between the drawer and the acceptor, or between the payee and the drawer—as the only consider-

---

* Leather v. Simpson, Law Reports, 11 Equity, 398.

ation as between those parties is that which moves from the plaintiff to the defendant; and the rule is, if that consideration fails, proof of that fact is a good defence to the action. But the rule is otherwise between the remote parties to the bill, as, for example, between the payee and the acceptor, or between the indorsee and the acceptor, as two distinct considerations come in question in every such case where the payee or indorsee became the holder of the bill before it was overdue and without any knowledge of the facts and circumstances which impeach the title as between the immediate parties to the instrument.   Those two considerations are as follows: First, that which the defendant received for his liability, and, secondly, that which the plaintiff gave for his title, and the rule is well settled that the action between the remote parties to the bill will not be defeated unless there be an absence or failure of both these considerations.*

Unless both considerations fail in a suit by the payee against the acceptor, it is clear that the action may be maintained, and many decided cases affirm the rule, where the suit is in the name of a remote indorsee against the acceptor, that if any intermediate holder between the defendant and the plaintiff gave value for the bill, such an intervening consideration will sustain the title of the plaintiff.†

Where it was arranged between a drawer and his correspondent that the latter would accept his bills in consideration of produce to be shipped or transported to the acceptor for sale, the Supreme Court of Pennsylvania held,‡ that the acceptor was bound to the payee by his general acceptance of a bill, although it turned out that the bill of lading forwarded at the same time with the bill of exchange was fraudulent, it not being shown that the payee of the bill

---

* Robinson v. Reynolds, 2 Q. B. 202; Same v. Same, in error, Ib. 210; Byles on Bills (5th Am. Ed.), 124; Thiedemann v. Goldschmidt, 1 De Gex, Fisher & Jones, Ch. App. 10.

† Hunter v. Wilson, 4 Exchequer, 489; Boyd v. McCann, 10 Maryland, 118; Howell v. Crane, 12 Louisiana Annual, 126; Watson v. Flanagan, 14 Texas, 354.

‡ Craig v. Sibbett et al., 15 Pennsylvania, 240.

was privy to the fraud. Evidence was introduced in that case showing that the payee knew what the terms of the arrangement between the drawer and the payee were, but the court held that mere knowledge of that fact was not sufficient to constitute a defence, as the payee was not a party to the arrangement and was not in any respect a surety for the good faith and fair dealing of the shipper.

Failure of consideration, as between the drawer and acceptor of a bill of exchange, is no defence to an action brought by the payee against the acceptor, if the acceptance was unconditional in its terms, and it appears that the plaintiff paid value for the bill, even though the acceptor was defrauded by the drawer, unless it be shown that the payee had knowledge of the fraudulent acts of the drawer before he paid such value and became the holder of the instrument.*

Testimony to show that the payees were not *bonâ fide* holders of the bills would be admissible in a suit by them against the acceptors, and would constitute, if believed, a good defence, but the evidence in this case does not show that they did anything that is not entirely sanctioned by commercial usage. They discounted these bills and they had a right to present them for acceptance, and having obtained the acceptance they have an undoubted right to apply the proceeds collected from the acceptors to their own indemnity.†

Forgery of the bills of lading would be a good defence to an action on the bills if the defendants in this case had been the drawers, but they were payees and holders for value in the regular course of business, and the case last referred to, which was decided in the Exchequer Chamber, shows that such an acceptance binds the acceptor conclusively as between them and every *bonâ fide* holder for value.

Very many cases decide that the drawee of a bill of exchange is bound to know the handwriting of his corres-

---

* United States v. Bank of Metropolis, 15 Peters, 393.

† Thiedemann v. Goldschmidt et al., 1 De Gex, Fisher & Jones, Ch. App. 10; Robinson v. Reynolds, 2 Q. B. 211.

pondent, the drawer, and that if he accepts or pays a bill in the hands of a *bonâ fide* holder for value, he is concluded by the act, although the bill turns out to be a forgery. If he has accepted he must pay, and if he has paid he cannot recover the money back, as the money, in such a case, is paid in pursuance of a legal obligation as understood in the commercial law.*

Difficulty sometimes arises in determining whether the plaintiff, in an action on a bill of exchange, is the immediate promisee of the defendant, or whether he is to be regarded as a remote party, but it is settled law that the payee, where he discounts the bill at the request of the drawer, is regarded as a stranger to the acceptor in respect to the consideration for the acceptance; consequently, if the acceptance is absolute in its terms and the bill is received in good faith and for value, it is no answer to an action by him that the defendant received no consideration for his acceptance or that the consideration therefor has failed; and it is immaterial in that behalf whether the bill was accepted while in the hands of the drawer and at his request, or whether it had passed into the hands of the payee before acceptance and was accepted at his request.†

Certain other defences, such as that the payments were voluntarily made, and that the title to the bills at the time the payments were made was in the National Park Bank, were also set up by the defendants, but the court does not find it necessary to examine those matters, as they are of the opinion that the payments, if made to the payees of the bills, as contended by the plaintiffs, were made in pursuance of a legal obligation and that the money cannot be recovered back.

JUDGMENT AFFIRMED.

* Goddard *v.* Merchants' Bank, 4 Comstock, 149; Bank of Commerce *v.* Union Bank, 3 Id. 234; Bank of the United States *v.* Bank of Georgia, 10 Wheaton, 348; Price *v.* Neal, 3 Burrow, 1355.

† Parsons on Bills, 179; Munroe *v.* Bordier, 8 C. B. 862.