### JOSEPH LANDA v. LATTIN BROS. ET AL.

Decided June 1, 1898.

**1. Appeal Bond—Justice Court.**

One of several defendants in justice court may appeal without making the bond payable to his codefendant who does not join in the appeal.

**2. Bill of Lading—Transfer—Negotiable Character.**

A bank which by transfer of a bill of lading acquires the right to property shipped in fulfillment of a contract of sale can enforce against the purchaser no greater right than that possessed by its vendor, the shipper.

**3. Same.**

A vendor of wheat under a contract warranting its quality, and with which warranty it failed to comply, shipped it from Kansas to Texas, taking bill of lading to the shipper's order with draft for purchase price attached, which it transferred to a bank and received credit therefor, the bank forwarding draft with bill of lading attached and delivering latter on payment by the purchaser, who had no previous opportunity to examine the grain. Held, that the bank acquired the right of property subject to the burdens imposed by the contract of sale and was liable to the purchaser for damages by breach of the warranty.

**4. Same—Agency.**

But the cashier of such bank to whom the draft was made payable, and intermediate banks, through whom it was forwarded for collection, being mere agents, incurred no personal liability.

**5. Bill of Lading—Negotiability.**

Assignees of bills of lading as representative of the property shipped are bound to the same diligence to protect themselves as others advancing or loaning money upon a security offered, the transfer of the bill giving no higher title than would the transfer of the property itself.

APPEAL from Comal. Tried below before Hon. H. TEICHMUELLER.

*F. J. Maier,* for appellant.

*Clark, Guinn & Guinn,* for appellees.

FISHER, CHIEF JUSTICE.—This is a suit by Jos. Landa against Lattin Bros., W. H. Eagan, W. L. Moody & Co., and the First National Bank of Hutchison, Kan., to recover $199.52, the amount of damages claimed by the plaintiff on account of a breach of contract, for selling and delivering to him damaged and musty wheat, the contract calling for sound wheat. Plaintiff at the same time garnished the First National Bank of New Braunfels, claiming that it had funds in its hands belonging to defendants.

In the trial court, the plaintiff recovered judgment only against Lattin Bros., and judgment was rendered to the effect that plaintiff recover nothing against W. H. Eagan and W. L. Moody & Co. and the First National Bank of Hutchison, Kan., and the First National Bank of New Braunfels, garnishee. From this judgment, the plaintiff has appealed to this court.

The admitted facts in the record are as follows:

"The plaintiff, through his agent at Wichita, Kan., made a contract with Lattin Bros., through letters and telegrams, to the effect that Lattin Bros. were to ship to plaintiffs 1376 bushels of sound, sweet wheat, for which plaintiffs were to pay $1005. The shipment and payment were to be made as follows: The wheat was to be loaded into two cars and sent 'shipper's order;' that is, Lattin Bros. were to procure bills of lading and attach drafts thereto, which bills of lading were to be indorsed and with the drafts turned over to a bank. The requisite amount of wheat was shipped, but instead of being sound and sweet, it was musty and of inferior quality, to the extent of 14½ cents a bushel, or $199.52, and the wheat received by the plaintiffs lacks $199.52 of being worth as much as the wheat contracted for. The shipment was made as follows: None of the purchase price of the wheat was paid in advance. The two cars were loaded and sealed, and two proper bills of lading were received by Lattin Bros. from the railroad company, showing the shipment to be to shipper's order. Lattin Bros. properly indorsed the bills of lading, the indorsement being in blank, and drew drafts on plaintiffs, in the aggregate amount of $1005, attached said drafts to the bills of lading, and turned them over to the First National Bank of Hutchison, Kan. The drafts were payable to W. H. Eagan, cashier of said bank. The bank on receiving the drafts and bills of lading gave Lattin Bros. credit for $1005, less customary exchange, on their account, and Lattin Bros. drew out said money by check. The Hutchison bank sent the drafts and bills of lading to W. L. Moody & Co., bankers at Galveston, who on receipt thereof, credited the Hutchison bank therewith, and the Hutchison bank debited said Moody & Co. Moody & Co. sent the drafts and bills of lad-

ing to the First National Bank of New Braunfels for collection, the latter bank acting as collecting agent for Moody & Co. The New Braunfels bank presented the drafts and bills of lading to plaintiffs, and plaintiffs paid said drafts of $1005 to said bank, and said bank turned the bills of lading over to plaintiffs. Plaintiff presented the bills of lading to the railroad company and received the wheat. The cars were still sealed, and the plaintiffs had no opportunity of seeing the wheat before the payment, as aforesaid. The wheat proved to be musty and inferior, as aforesaid, and the New Braunfels bank sent the proceeds of the wheat to Moody & Co.

"About ten days after this, plaintiff's agent also made a contract for three cars of corn with said Lattin Bros. for $223. This contract was independent of the wheat contract, and was in every respect the same as the wheat contract, and the shipment and collection of the money was in every respect the same as with the wheat. Drafts were attached to the shipper's order bills of lading, bills of lading were indorsed in blank, turned over to said Hutchison bank, credit given, turned over to Moody & Co., and by the latter sent to the New Braunfels bank for collection, precisely in every respect as the wheat transaction. Plaintiffs also paid the New Braunfels bank the $223, and before the money left said bank, filed this suit and garnished the said New Braunfels bank, as shown by the garnishment proceedings in the case. The connection that W. H. Eagan, the Hutchison bank, and Moody & Co. had with these transactions was in receiving the drafts and bills of lading, indorsed as aforesaid, in receiving the purchase money for the wheat from the plaintiffs, and they had no actual knowledge of the terms of the agreement between plaintiffs and Lattin Bros. They had nothing to do with the original agreement with Lattin Bros. other than as shown herein. Lattin Bros. were customers of the Hutchison bank and did banking business with them. The proceeds of the corn is still in the hands of said New Braunfels bank, which it holds under the writ of garnishment. The transactions between the parties and the banks were all in the ordinary and customary way. After Moody & Co. found out that the proceeds of the corn were garnished, they charged the Hutchison bank up with this $223, for which they had given it credit at the time that they received the drafts and bills of lading for the corn. The banks know that shipments of this character are seldom made without some understanding between the original assignor and the original assignee (the person to be notified). The Hutchison bank is out its money that it paid to Lattin Bros. for the corn shipment of $223, and has never received the same, which is now in the hands of the New Braunfels bank, garnishee, and this money has been detained by virtue of the writ of garnishment sued out herein, as stated by the garnishee in his answer. No contract was made by the plaintiff with any of the defendants except Lattin Bros., and the said other defendants than Lattin Bros. had no knowledge of any, except as being purchasers of the drafts and bills of lading, as hereinbefore stated. Defendants Eagan and the Hutchison bank, when they

received the drafts in question and the bills of lading attached, before paying for the same, required Lattin Bros. to indorse the same to them. This agreement does not affect or neutralize the bills of exceptions."

In response to those assignments of error which complain of the refusal of the trial court to dismiss the appeal, because the appeal bond from the Justice Court was not made payable to Lattin Bros., or they were not made parties to the appeal, it is sufficient to say that there was no error in this ruling.

The real question in the case is whether under the admitted facts the plaintiff can hold any of the appellees except Lattin Bros. responsible for the amount sued for. From the manner in which the principal question is treated by the parties in their briefs, it is supposed that the court below proceeded upon the theory that the First National Bank of Hutchison, Kan., by reason of the transfer to it of the bills of lading, became the owner of the wheat, unaffected by the contract between the appellant and Lattin Bros., it appearing that the bank advanced to Lattin Bros. the full value of the wheat, without notice of any of the terms of the contract under which they had agreed to sell and deliver the same to the appellant. The advancement by the First National Bank of Hutchison to Lattin Bros. of the full value of the wheat, together with the fact that the bills of lading therefor issued by the railway company to Lattin Bros. were transferred by them to the bank, vested in the bank the superior title to the wheat. Banking Co. v. Landa, 33 S. W. Rep., 681. The real inquiry is as to what effect should be given to this transaction, so far as it related to the rights of appellant Landa under the contract between him and Lattin Bros. The correct rule concerning the rights of a purchaser or an assignee by transfer of a bill of lading, and the quasi quality of negotiability of such instruments, is thus stated in the fourth volume of the second edition of the American and English Encyclopedia of Law, page 549, where it is said:

"While the transfer of bills of lading may pass the title to the goods, unless the common law has been modified by statute, these instruments are not negotiable, in the sense in which that term is applied to bills and notes and other negotiable instruments of a like character. Although it has sometimes been said that a bill of lading is negotiable, nothing more is meant by this than that the transfer of the bill of lading passes to the transferee the title of the transferer to the goods described therein.

"Negotiability may be predicated of bills of exchange and promissory notes, because they are the representatives of money, which is itself negotiable, to the extent that it can not be reclaimed from anyone who receives it in good faith for value. On the other hand, bills of lading do not stand as representatives of money, but of the goods therein described, and as chattels are not negotiable, that quality can not be given to the symbol; no greater effect can be given to the transfer of the symbol than to that of the thing which it represents.

"The transfer of a bill of lading, then, by the person in possession of the instrument, can give no higher title than would the transfer of the

property itself by the same person. Hence it may be stated, as a general rule, that where bills of lading are made negotiable by statute, the holder of a bill of lading, in the absence of either title to the goods or authority to transfer them in himself, can not, by a transfer of the instrument, pass the right of property in the goods, even to a bona fide purchaser for value; he can convey no greater rights than he himself has."

The Supreme Court, in support of the text, in the case of Shaw v. Railway, 101 U. S., 557-564, says: "The function of that instrument [bill of lading] is entirely different from that of a bill or note. It is not a representative of money, used for transmission of money or for the payment of debts or for purchases. It does not pass from hand to hand as bank notes or coin. It is a contract for the performance of a certain duty. True, it is a symbol of ownership of the goods covered by it, a representative of those goods. * * * Bills of lading are regarded as so much cotton, grain, iron, or other articles of merchandise. The merchandise is very often sold or pledged by the transfer of the bills which cover it. They are, in commerce, a very different thing from bills of exchange and promissory notes, answering a different purpose and performing different functions. It can not be, therefore, that the statute which made them negotiable by indorsement and delivery or negotiable in the same manner as bills of exchange and promissory notes are negotiable, intended to change totally their character,—put them in all respects on the footing of instruments which are the representatives of money and charge the negotiation of them with all the consequences which usually attend or follow the negotiation of bills and notes. Some of these consequences would be very strange, if not impossible, such as the liability of indorsers, the duty of demand ad diem, notice of nondelivery by the carrier, etc., or the loss of the owner's property by the fraudulent assignment of a thief."

There are exceptions to this general rule, but they rest more on the ground of estoppel than the negotiability of bills of lading. Such, notably, is the case of Railway v. Heidenheimer, 82 Texas, 195. In that case, the consignor, the party who sold the goods to the consignee, received from the railway company duplicate bills of lading. One of these was forwarded to the consignee and received by him, and during the transit of the goods the consignee transferred and sold the goods to Heidenheimer, and turned over and delivered to him the bill of lading which he had received therefor. The consignee was then insolvent, and the consignor attempted to assert the right of stoppage in transitu, and recover possession of the goods. The real contest in the case was whether the goods belonged to Heidenheimer or the consignor. The effect of the ruling upon this question in that case was that a transfer and assignment of the bills of lading was sufficient to invest the assignee with title to the goods called for in the bill of lading; and as the consignor had, by delivering to the consignee the bill of lading, the evidence of the right to the goods, by investing him with the apparent evidences of title, put the consignee in a position to mislead third parties, a transfer by the con-

signee under such circumstances would preclude a recovery by the consignor of the goods from such purchaser. But a different principle, we think, governs this case. Here, the First National Bank of Hutchison purchased from the consignor, before delivery to the appellant, the wheat in question, and knew at the time that the wheat was not paid for by appellant, and undertook to deliver the same to him, and in effect carry out the contract which had been entered into between the appellant and Lattin Bros. The Hutchison bank, as the purchaser from Lattin Bros., the original consignors, acquired against Landa no greater right in the property or shipment than that possessed by the vendors of the bank; and where it seeks to enforce against the consignee the contract entered into between the latter and the consignors, it is charged with the same defenses that could be urged where the contract was sought to be enforced between these parties.

Now the bank, when, by a transfer of the bills of lading to it by Lattin Bros. it acquired the right to the property they represented, could enforce against the purchaser thereof no greater right than that possessed by its vendors. It acquired title to the property in its then condition, and if it was wheat of a damaged or defective quality, the fact that it supposed that it was worth the amount of money paid therefor to Lattin Bros. did not convert it into wheat of a superior quality, nor authorize them to demand from Landa, upon a tender of the wheat, payment of the full sum it was out by the transaction.

When the bank purchased the wheat, it was substituted to the same rights, and no more, possessed by its vendors to enforce against Landa the contract entered into between him and Lattin Bros.; and if it had sought to enforce the contract by action, it could only do so charged with its burdens, and Landa could have in defense asserted any breach thereof that he could have urged against Lattin Bros.

The bank in this case reaped the benefit of the contract in this, that upon presentation to Landa of the bills of lading, it received the full amount due under the contract for a shipment of sound wheat. Landa, before payment, did not have an opportunity to inspect the wheat, and only discovered its damaged condition thereafter. The bank in this way electing to reap the benefit of the contract existing between Lattin Bros. and appellant, became bound by it; and as it was the owner of the wheat, and undertook to carry out the contract, it assumed the same position in relation to the transaction as its vendors. It enjoyed no greater rights, and occupied its position charged with the demands that could have been urged against its vendors for a breach of the contract.

The facts beyond dispute show clearly that there was a breach of the contract. Lattin Bros. and the Hutchison bank, which succeeded to their rights under the contract, delivered to the appellant wheat in a damaged condition, when the contract called for sound wheat, and the bank received therefor payment for sound wheat. This presents a clear case of a breach of warranty as to the quality of the article purchased; and because the bank, in purchasing from Lattin Bros., may not have

known of the inferior quality of the article purchased, would not, in its undertaking to perform the contract with Landa, justify it in imposing upon Landa wheat of a quality different from that called for in the contract.

The court in the case of Bank v. Bank, 91 U. S., 98, says: "That the holder of a bill of lading, who has become such by indorsement, and by discounting the draft drawn against the consigned property, succeeds to the situation of the shipper, is not to be doubted. He has the same right to demand acceptance of the accompanying bill and no more. If the shipper can not require acceptance of the draft without surrendering the bill of lading, neither can the holder. Bills of lading, though transferable by indorsement, are only quasi-negotiable. 1 Parsons on Shipping, 192; Blanchard v. Page, 8 Gray, 297. The indorser does not acquire a right to change the agreement between the shipper and his vendee. He can not impose obligations or deny advantages to the drawee of the bill of exchange drawn against the shipment, which were not in the power of the drawer and consignor."

National Bank v. White, 65 Missouri Appeals, 679, was a case where a manufacturer of lumber and shingles sold and shipped to a dealer a car load of shingles, and at the same time drew a draft on the purchaser with a bill of lading attached, and assigned the same to the plaintiff, the banking company. When the shingles arrived they were found to be of inferior quality, and the purchaser, the defendant, refused to pay the draft. Thereupon the bank sued him for the entire amount of the draft. The purchaser interposed his defense; and from the brief of the appellant in the report of the case, it appears that the bank contended that it acquired the bill of lading and became the purchaser of the shingles in the due course of trade, for a valuable consideration, unaffected by the contract under which they were purchased by the defendant. The court in supporting the contention of the defendant says: "We can discover no prejudicial error in the trial of this case, and since, too, substantial justice has been done, the judgment will not be disturbed. Plaintiff's counsel are right in the contention that when the bank took an assignment of the draft and bill of lading from the lumber company—whether as an absolute purchase or as collateral security—it became vested with the title of the property. From that time on, plaintiff occupied the same relation towards the shingles, then in transit, that the lumber company did before the bill of lading was transferred. The assignment of the bill of lading operated as a symbolical delivery of the property covered by it. However, the rights of White, the consignee, were not impaired or disturbed by the change of ownership in the property. He was left with the same defenses as against plaintiff bank that he would have as against the lumber company."

Now, from these views, the conclusion is reached that the First National Bank of Hutchison, in becoming the owner of the wheat and undertaking to deliver it to Landa, became responsible for performance of the contract which had been entered into between the latter and Lattin

Bros. They could not, by a delivery of the wheat, and electing to reap the benefits of that contract, and demanding the payment of the sum called for, and receiving the same, take the position that they were not parties to the contract between the appellant and Lattin Bros., and that in acquiring title to the wheat they became purchasers thereof unaffected by the burdens of that contract.

The facts and circumstances show that the bank undertook its performance; and, such being the case, they had no greater rights against Landa than were possessed by Lattin Bros. The injury to the appellant is in part traceable to the conduct of the bank in delivering to the appellant, and exacting payment therefor, wheat of a damaged and defective quality; and upon a discovery of the defective quality of the wheat by Landa, a cause of action arose in his behalf against the bank, to recover from it the damages he had sustained, by reason of the wrong imposed upon him, in delivering to him, and exacting from him payment for the damaged wheat.

The transaction concerning the shipment of the corn shows that the Hutchison bank was the owner of that shipment, and that the proceeds that arose from the sale of the same, and which were paid by Landa into the First National Bank of New Braunfels, were the property of the First National Bank of Hutchison. Therefore, for the cause of action asserted by Landa against the First National Bank of Hutchison for the damages resulting from the breach of the contract in the delivery of the wheat, garnishment process would run against the funds in the New Braunfels Bank that arose from the sale of the corn.

The facts in the record do not show any liability against the appellee Eagan, as it seems he was only acting as the representative of the Hutchison bank. Nor does it show any liability against W. L. Moody & Co., because they were simply the collecting agents for the First National Bank of Hutchison; and the funds now on hand in the possession of the First National Bank of New Braunfels really belong to and are owned by the First National Bank of Hutchison.

The inconvenience to which banks may be put, and the manner in which commercial transactions with its customers may be affected by the rule announced in this opinion, are questions with which we are very little concerned, as we apprehend that the principles of law that would apply to individuals in dealing in transactions of this character would also apply to banks in dealing with their customers.

The appellees on this branch of the case in their brief say: "If the banker had to examine the contract between the original shippers and purchaser of the goods, to see and know its terms, and then examine the cargo, to see if it complied with the terms of the original contracting parties, upon penalty of being held liable for some real or imagined defect therein, we fancy that there would be very little business of this kind carried on by the banks."

The diligence required of banks in their efforts to protect themselves for moneys advanced to their customers should extend to an inquiry as to

the value of the articles upon which they make such advances. It was a matter of slight inconvenience to this bank to have made investigations as to the quality of the wheat which it purchased from Lattin Bros., and as to the terms of the contract between Lattin Bros. and the appellant. It could not, by relaxing diligence in this respect in the purchase of wheat in a damaged condition, by paying therefor a price for sound wheat, impose its want of diligence upon Landa, and make him responsible for its want of caution, by exacting from him payment for sound wheat. Landa was only responsible for the character of wheat which was actually delivered to him; and, as this was of an inferior quality and in a damaged condition, the bank, because it was imposed upon by Lattin Bros., would not have the right to likewise impose upon Landa.

The duty of a bank to exercise diligence to protect and guard its interests in a transaction of this character is as great as would be the case in a bank advancing or loaning its money upon a security offered by a borrower. Except in cases of the purchase of negotiable paper, or advancing money upon paper of that character, a bank, as anyone else advancing money upon a contract which its customer may have with another party, would be put upon inquiry to ascertain the terms of that contract and the extent of the right of its customer thereunder; and the bank, in dealing with one claiming under such a contract and as to the articles it represents, could not, because it was ignorant of its true terms and the rights of the other party, enlarge the responsibility of that party, and impose upon him a liability different from that called for in the contract.

Upon this question we quote with approval what is said by the court in Robinson v. Railway, 9 Federal Reporter, 134:

"And these considerations can not be overlooked or overborne by the supposed benefits of having the commercial world supplied with an assurance against inconvenience in their dealings, not with the carrier, but with each other. To illustrate by this case, it is plain that the Bank of Madison, when it discounted the draft and took the bill of lading, could have known, being in the same town, by sending a messenger to the agent, depot, or warehouse of the company, that this was a false bill of lading. So, although these plaintiffs in New York could not so readily have ascertained that fact, they could have protected themselves by refusing to accept the drafts until the cotton had arrived, or until by telegraph they had assured themselves of the existence of the cotton. 16 Am. Law Reg. (N. S.), 1. They both, no doubt, trusted more to the ordinary honesty of human nature and the particular honesty of Chiles than they did to this bill of lading, or at least as much; and, at all events, the person who signed the bill of lading trusted to that honesty, if he was not particeps criminis, and I do not see why one should lose more by the trust than the other. And in this connection, it must be remembered that Chiles was the plaintiffs' regular customer. Hoffman v. Bank, etc., 12 Wall., 190. Certainly, in my judgment, an extraordinary liability so beyond the scope of the actual contract of the carrier, and beyond the general business he is engaged in, should not be imposed to save a bank

from the inconvenience of sending a messenger a few squares in the same town, or yet to expedite by a few days or moments the dealings between a cotton factor and his customer upon any theory that it is in the interest of commerce to do this. A factor must attend to the honesty of his customer, and so a bank; and they should know that a common carrier is confined to the business of carrying goods actually delivered, has no liability till they are delivered, and that delivery, and not the signing of the bill of lading, is the initial point of the contract and the liability.

"Mr. Justice Willes said, in a case involving a fraudulent dealing with a bill of lading, that 'Arguments founded upon the notion that the court is to pronounce a judgment in this case which will protect those who deal with fraudulent people, are altogether beside the facts of this case and foreign from transactions of this nature. To attempt such a task would be idle; to accomplish it, impossible. We must apply our minds to the facts of the case before us, and see what is their true bearing, and what is the proper conclusion we ought to arrive at in respect to the litigant parties, without considering what may hereafter happen to persons who omit to use diligence and consequently to have the misfortune to be overreached.' And this was emphasized, when the case went to the House of Lords, by Lord Chancellor Hatherley, in language I forbear to quote, only because it requires space to present it properly. Meyerstein v. Barber, L. R., 2 C. P., 38, 51; same case, 4 H. L., 317, 332. The holder of the first two parts of a bill of lading, who had made advances on it, sued, in that case, the holder of the third part, who had in good faith, relying on the bill of lading, purchased the goods, and recovered their value, notwithstanding the argument just alluded to, which is the same suggested by the averments of the declaration and pressed in argument here. The principle established is, that because others may deal fraudulently with bills of lading, furnishes no ground for the court, in the supposed interest of commerce, to disregard the ordinary rules governing the contract of the parties in order to protect those who carelessly neglect to take the precautions that would protect themselves."

We have reached the conclusion that the judgment of the court below should be reversed and here rendered in favor of the appellant against Lattin Bros. and the First National Bank of Hutchison, Kan., in favor of appellants and against the garnishee, the First National Bank of New Braunfels, for an amount equal to the sum due the appellant by Lattin Bros. and the First National Bank of Hutchison, not to exceed the sum held by the garnishee.

The judgment as to Moody & Co. and as to Eagan will be affirmed.

*Reversed and rendered in part and affirmed in part.*