(44 South. 753.)

No. 16,586.

VARNEY v. MONROE NAT. BANK.

In re VARNEY.

(June 17, 1907.  On Rehearing, Oct. 8, 1907.)

1. BILLS AND NOTES—GENUINE DRAFT WITH FORGED BILL OF LADING.

A draft was discounted, with bill of lading attached. It was genuine, and was drawn on plaintiff with his authorization, and was paid by him. The bill of lading was a forgery.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 7, Bills and Notes, § 1269.]

2. SAME—ERROR.

Plaintiff sued the defendant to return the amount, on the ground that it was paid in error and that defendant was liable for the error.

3. SAME — BUSINESS RELATION BETWEEN DRAWER AND PLAINTIFF.

What mistake there was, was plaintiff's, for trusting the dishonest drawer of the draft, who annexed to it a forged bill of lading.

Provosty and Monroe, JJ., dissenting.

(Syllabus by the Court.)

Action by E. B. Varney against the Monroe National Bank. Judgment for defendant was affirmed by the Court of Appeal, and plaintiff applies for certiorari or writ of error. Petition dismissed.

Andrew Augustus Gunby, for applicant. Hudson, Potts & Bernstein, for respondent.

BREAUX, C. J.  Plaintiff instituted this suit against the Monroe National Bank for the amount of $1,229.69.

The drawer, Bandy, attached a bill of lading to his draft for 25 bales of cotton, which bill of lading was indorsed by Bandy. It was cashed by the bank and forwarded to the drawee, Varney, in Massachusetts for payment.

The draft and the bill of lading were presented to plaintiff, who paid the draft.

The bill of lading showed, as regards the bales of cotton, that it was consigned to shipper's order; i. e., Bandy's. It was not even consigned to Varney's order.

The bill of lading was a forgery. No cotton was ever shipped by Bandy from Monroe, and plaintiff was imposed on by Bandy. He paid this draft to the bank, as he alleged, in error, believing that the cotton had been shipped to him and that the bill of lading was genuine.

The plaintiff sued the defendant bank, as payee and discountee, through whose instrumentality the draft was transmitted and collected.

Defendant pleaded practically a general denial, admitted that it had discounted the draft and forwarded it with the bill of lading, but denied that it had guaranteed the genuineness of the bill of lading attached to the draft.

There was judgment in the district court rejecting plaintiff's demand, and on appeal to the Court of Appeal, sitting at Monroe, La., this judgment was affirmed.

The appellant asked for a restraining order from this court, which was granted.

The papers before us bring up the issues of the case.

Bandy was a local buyer of cotton, and Varney sold it to spinners at Fall River, Mass.

Plaintiff, in November, 1904, wired to Bandy to ship 25 bales, naming the price. Bandy replied:

"*We* [italics] have bought twenty five bales at the price named."

The *we* (italics) evidently referred to Varney and Bandy, who were, as we take it, acting together in the buying and selling of cotton.

The day following the days of these telegrams, the plaintiff wrote to Bandy confirming "our several telegrams regarding 25 bales cotton."  The letter contains the following:

"Grading strictly middling, $11/16$ staple, price $9\frac{3}{4}$ f. o. b. and freight and return commission. Sight draft on me."

This letter was signed by plaintiff.

The following is an excerpt from the testimony of plaintiff.

The cotton was to be shipped by common carrier, and to be paid for by sight draft with bill of lading attached, and sent through the bank in ordinary course, and presented to Varney in Fall River.

Bandy did not buy the cotton and make the shipments, but none the less drew on plaintiff and attached a bill of lading. The draft was discounted by the bank and forwarded to the domicile of plaintiff, who paid it.

It became known that the bill of lading was a forgery and Bandy a fugitive.

The business relations between plaintiff and Bandy dated from a number of years back. Bandy wrote to plaintiff in September, 1902 (this was at the beginning of their business relations), that he was indebted to a friend, naming him, for his name as a good, wide-awake broker. This must have led to some agreement between them, for a short time thereafter Varney wired: "We can sell two hundred more at eleven cents." And not long thereafter Bandy sent a telegram to Varney, acknowledging receipt of information of sale of 50 bales of cotton.

Some nine or ten different lots of cotton were bought and sold altogether during the time that they kept up whatever business relations there was between them. Letters and telegrams passed.

Varney became tired of Bandy's dilatoriness in money matters. In March, 1904, he called his attention to the fact that there was a considerable balance still due him, most of which, he said, was commission due him. In one of the last letters before the forgery plaintiff took Bandy to task for his neglect in not paying the balance due. His complaint was quite pronounced and showed impatience on account of the delay in money matters.

There are incidents of the case referred to in the brief, such as that the junior counsel, when called upon by plaintiff, expressed the opinion to him that the amount of the discounted draft which plaintiff had paid would be returned to him.

Plaintiff also charges that Bandy had done things sufficient to excite suspicion of his crookedness; that the defendant bank had written an identifying memorandum on the draft, which identified it with the bill of lading in such a way as to identify one with the other as relates to liability in discounting the draft.

Plaintiff also charged that the bill of lading was on blue paper, which was used only for shipments within the state of Louisiana.

The contention of the appellant, taken in its last alternative or aspect, is that plaintiff in error is entitled to a return of the amount paid, and that it matters little what the relations of plaintiff with Bandy were; that if they were, as found by the district court and by the Court of Appeal, that of a broker to his principal, that none the less Varney paid by mistake.

Plaintiff invoked the articles of the Code which provide that he who receives what is not due him by error unknowingly is obliged to restore it (Civ. Code, art. 2301 et seq.); that these articles have application, because Varney paid through mistake.

It is undoubtedly true that the general principle of the Code governs in commercial transactions, if it contains applying provisions to the issues involved.

It was not the first time that Bandy, the drawer on plaintiff, had discounted his draft precisely in the same manner that the discount was obtained in this instance.

It must be borne in mind that part of the transaction was legal. The draft was genuine. The forged bill of lading did not vitiate the draft, as it does not appear that the defendant had the least knowledge on the subject. The bill of lading was not indorsed by the bank. Plaintiff's correspondent, with whom he had business dealings, was not worthy of his confidence.

Misplaced confidence, which may happen to any one, brings on a situation sometimes which one must accept without being able to obtain relief against third persons.

The case of Hoffman v. Bank, 12 Wall. (U. S.) 186, 20 L. Ed. 366, is leading.

The following is a summary of it:

The defendant presented a draft to the plaintiff, accompanied with a forged bill of lading. Plaintiffs, believing the bills of lading genuine, paid the money to defendant. The contention of the plaintiffs in their suit against the defendant to have the money returned was that they paid the draft under a mistake. The defendant conceded that the plaintiffs had paid the money by mistake, but pleaded that the bill of lading was not indorsed by the bank, and that for that reason the bank could not be held; that no representation of any sort was made by the bank to plaintiffs.

The court held that the bills of exchange were in the usual form and contained no reference to the bills of lading; that it was not pretended that the defendant had any knowledge or intimation that the bills of lading were not genuine, and that it was not pretended that they made any representation upon the subject to induce the plaintiffs to pay the draft; that they received the bills of exchange as a bank discount, and paid the full amount of the net proceeds to the drawers; and that it was not suggested that any acts of the defendant, except indorsement of the bills of exchange in the usual course of business, operated to the prejudice of plaintiff.

"Forgery as to bills of lading," said the court, "would be a good defense to an action, if defendants had been drawers; but they were payers and holders for value."

Well-considered English decisions are substantially similar. In a well-considered case the court said that it illustrated the perils of commercial life; that the case was one of perfect good faith on both sides, and the question was which of the two innocent parties was to suffer by the fraud which had been committed by issuing forged bills of lading; substantially that the bank could not be held in guaranty of the genuineness of the bill of lading; and that the plaintiff had no equity to recover back the money which had been paid on a genuine bill of exchange, which had, for security, what was taken to be a genuine bill of lading, but which was, on the contrary, a forgery. 11 English Law Reports (1870–1871) 398.

In the main the same was Robinson v. Reynolds, 2 Adol. & El. (N. S.) 196.

The bank cannot be held as in the case of a sale of a thing. The warranty is no longer the same. The genuineness of the instrument defeats the possibility of obtaining a return of the money. Landa v. Lattin Bros., 19 Tex. Civ. App. 246, 46 S. W. 48.

In another well-considered case it was decided that the "purchaser of a draft attached to a bill of lading does not transfer title to the goods, so as to render the purchaser of the draft responsible for the contract upon which the goods were shipped." Lewis v. Small (Tenn.) 96 S. W. 1051, 6 L. R. A. (N. S.) 887.

The special features of the case urged by plaintiff, to which we have made reference in our statement of the facts above, do not take the case out of the rules in commercial law.

One of these features urged by the plaintiff is that the discounting bank might have protected itself by inquiry before discounting the draft.

It is sufficient defense to state that the acceptor—that is, the plaintiff, by whom the draft was paid—might have protected himself by declining to pay before receiving the cotton. He might have protected himself by a special agreement with the bank to see into the genuineness of bills.

This is only mentioned to say that on the score of protection against forgery the plain-

tiff was at least as much at fault as the defendant was, if the defendant was at all in this instance.

Some mention has been made of the fact that the color of paper was something in the nature of warning. It was not the color of paper used by railroads in issuing interstate bills of lading.

We have noted that carriers issue a bill of lading of one color in carrying goods within the state, and of another color in carrying goods within a distance.

This railroad usage about colors of bills of lading may not be known to business men generally. Besides, it was as much incumbent upon plaintiff to take notice as for the defendant.

It was also charged that the drawer of the draft was not a man of the highest integrity; that some of his paper had gone to protest.

This is not sufficient to discredit paper, and enable the acceptor and payer of a draft to obtain the return of money paid under the circumstances. Goetz v. Bank of Kansas City, 119 U. S. 551, 7 Sup. Ct. 318, 30 L. Ed. 575.

It is of the highest importance to commercial interests that discredit should never be thrown upon negotiable instruments, if possible to avoid it, and for that reason, if none other, be vitiated because of the defect, or even forgery, of an accompanying paper.

Before concluding, liberal quotation will be made from a recently decided case by a court of last resort of another state.

The discountee had discounted several drafts. Goetz v. Bank of Kansas City, 119 U. S. 551, 7 Sup. Ct. 318, 30 L. Ed. 575. The consignee, after paying several of the drafts, discovered that the bills of lading were forged, whereupon he refused to pay one draft which he had accepted and sued to recover on the drafts he had paid.

In deciding, the Supreme Court of the United States reviewed several leading English court decisions, one especially that we have cited supra. That exalted tribunal (the federal Supreme Court) said, in regard to the rule:

"This has been held in numerous cases, and was directly adjudged in Hoffman v. Bank, 12 Wall. (U. S.) 181, 20 L. Ed. 366; Goetz v. Bank of Kansas City, 119 U. S. 551, 7 Sup. Ct. 318, 30 L. Ed. 575."

In 119 U. S. 551, 7 Sup. Ct. 318, 30 L. Ed. 575, the discountee had indorsed on the invoices the words "for collection." As this part of the decision is directly pertinent, we insert it here:

"The court held that the bank did not, by discounting the drafts, or by indorsing the invoices accompanying the bills of lading 'for collection,' guarantee the genuineness of the bills of lading, and that its right to recover on the acceptances was not defeated by the mere failure to inquire into the consideration of the drafts."

The case is applicable on the different points here involved. The jurisprudence of the nation, as expressed by its highest court, is generally accepted as controlling in matters relating to commercial law, where there is no statutory rule to the contrary.

The Hardie Case, 118 La. 253, 42 South. 793, relates to bills of lading which through negligence and oversight remained in commerce after they should have been returned. They fell into third hands, and they claim payment. The third holder was protected. The decision is not pertinent here. Bills of lading are commercial paper, and negotiable as such. In the pending case one of the commercial instruments was good and valid, and was paid by plaintiff, as others had been paid by him.

The security was bad. That did not have the effect of destroying the good.

The Supreme Court of Tennessee decided recently: The purchaser of a draft attached to a bill of lading does not transfer title to the goods, so as to render the purchaser of the draft responsible upon the contract in accordance with which the property was shipped.

A national bank has no authority to deal in merchandise, so as to render itself liable for the full delivery of a consignment of merchandise.

The court goes at some length in its inquiry regarding the authority of the national banks. Lewis v. Snell (Tenn.) 96 S. W.'1051, 6 L. R. A. (N. S.) 887. The decision here does not rest on that ground, although the cited decision seems to rely on good ground and authority.

For reasons assigned, it is therefore ordered, adjudged, and decreed that the order which was served in this case be recalled and discharged. The demand is disallowed, and the petition dismissed.

PROVOSTY and MONROE, JJ., dissent.

## On Rehearing.

LAND, J. This case falls squarely within the doctrine, announced in Goetz v. Bank of Kansas City, 119 U. S. 551, 7 Sup. Ct. 318, 30 L. Ed. 575, that "a bank, in discounting commercial paper, does not guarantee the genuineness of a document attached to it as collateral security." In the Goetz Case the bank not only indorsed for collection the bills of exchange, but also some of the invoices attached to the forged bills of lading. In the case at bar there was no invoice, and the bank made no indorsement on the bill of lading. The bill of exchange was drawn at sight in the usual form, and contained no reference to the bill of lading, which as a matter of fact was délivered to the bank at the same time. One of the officers of the bank wrote "25 B/C" above the name of the drawer, evidently for the purpose of showing the connection between the draft and the bill of lading. The drawee fully understood that there was no cotton connected with the bill of exchange, except that supposed to be covered by the bill of lading, and paid the draft on the faith of the forged bill of lading, and not by reason of the memorandum on the face of the draft.

The doctrine of the Goetz Case, supra, is based on the well-settled rule of commercial law that the consideration of a bill of exchange, as between the drawer and drawee, does not affect the rights of a bona fide indorser for value.

Rehearing refused.