## GOETZ v. BANK OF KANSAS CITY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF WISCONSIN.

Argued November 24, 29, 1886. — Decided January 10, 1887.

The acceptor of a bill of exchange discounted by a bank with a bill of lading attached which the acceptor and the bank regard as genuine at the time of the acceptance, but which turns out to be a forgery, is bound to pay the bill to the bank at maturity.

The bad faith in the taker of negotiable paper which will defeat a recovery by him must be something more than a failure to inquire into the consideration upon which it was made or accepted, because of rumors or general reputation as to the bad character of the maker or drawer.

In an action against the acceptor of a bill of exchange, with alleged fictitious bills of lading attached, articles from newspapers touching the drawer as to other drafts with like bills attached were properly excluded as having no connection with the transaction in controversy, it not appearing that the holder ever saw them.

Evidence of declarations of an agent as to past transaction of his principal is inadmissible, as mere hearsay.

In an action by a bank against the acceptor upon a draft discounted by the bank with a fraudulent bill of lading attached, the president of the bank, as a witness for it, having testified that he was ignorant of the forgeries, and also of the circumstances attending other drafts by the drawer with forged bills of lading attached which had been discounted by the bank, and that he could only explain why pains were not taken in the matter by explaining the usage of the bank, it is competent for the court to receive such explanation of the usage.

This was an action against the plaintiff in error, the acceptor of bills of exchange with forged bills of lading attached, which had been discounted by the defendant in error, and presented for acceptance without knowledge of the fraud in either party. Judgment for defendant, to review which this writ of error was sued out. The case is stated in the opinion of the court.

*Mr. F. W. Cotzhausen,* for plaintiff in error, cited: *Baylis* v. *Travellers' Ins. Co.,* 113 U. S. 316; *Burnside* v. *Grand Trunk Railway,* 47 N. H. 554; *Xenia Bank* v. *Stewart,* 114 U. S.

224; *Hoffman* v. *Bank of Milwaukee*, 12 Wall. 181; *Goodman* v. *Simonds*, 20 How. 343; *Bank of Commerce* v. *Union Bank*, 3 N. Y. (3 Comst.) 230; *Canal Bank* v. *Bank of Albany*, 1 Hill, 287; *Bank of Commerce* v. *Merchants' Bank*, 91 U. S. 92; *Lowry* v. *Commercial Bank*, Taney's Dec. 310; *United States* v. *Bank of Metropolis*, 15 Pet. 377; *Stewart* v. *Lansing*, 104 U. S. 505; *Duerson* v. *Alsop*, 27 Gratt. 229; *Smith* v. *Sac County*, 11 Wall. 139; *Clark* v. *Pease*, 41 N. H. 414; *Solomons* v. *Bank of England*, 13 East, 135 n.; *Gill* v. *Cubit*, 4 B. & C. 466; *People* v. *Howell*, 4 Johns. 296; *Uther* v. *Rich*, 10 Ad. & El. 784; *Carroll* v. *Hayward*, 124 Mass. 120; *Jones* v. *Gordon*, 2 App. Cas. 616; *Raphael* v. *Bank of England*, 17 C. B. 161; *Andrews* v. *Pond*, 13 Pet. 65; *Fowler* v. *Brantly*, 14 Pet. 318.

*Mr. Oliver H. Dean*, for defendant in error, (*Mr. William Warner* and *Mr. James Hagermann* were with him on his brief,) cited: *Hoffman* v. *Bank of Milwaukee*, 12 Wall. 181; *Craig* v. *Sibbett*, 15 Penn. St. 238; *Thiedemann* v. *Goldschmidt*, 1 De G. F. & J. 4; *Leather* v. *Simpson*, L. R. 11 Eq. 398; *First Nat. Bank* v. *Burkham*, 32 Mich. 328; *United States* v. *Bank of Metropolis*, 15 Pet. 377; *Young* v. *Lehman*, 63 Ala. 519; *Park Bank* v. *Ninth Nat. Bank*, 46 N. Y. 77; *Goddard* v. *Merchants' Bank*, 4 N. Y. (4 Comst.) 147; *Bank of Commerce* v. *Union Bank*, 3 N. Y. (3 Comst.) 230; *Bank of the United States* v. *Bank of Georgia*, 10 Wheat. 333; *Price* v. *Neal*, 3 Burrow, 1354; *Goodman* v. *Simonds*, 20 How. 343; *Murray* v. *Lardner*, 2 Wall. 110; *Hotchkiss* v. *Nat. Bank*, 21 Wall. 354; *Collins* v. *Gilbert*, 94 U. S. 753; *Shaw* v. *Railroad Co.*, 101 U. S. 557; *Swift* v. *Smith*, 102 U. S. 442; *Belmont Branch Bank* v. *Hoge*, 35 N. Y. 65; *Hamilton* v. *Marks*, 63 Missouri, 167; *Sweeney* v. *Easter*, 1 Wall. 166; *First Nat. Bank* v. *Reno County Bank*, 1 M'Crary, 491; *White* v. *National Bank*, 102 U. S. 658; *The Sallie Magee*, 3 Wall. 451; *Hannum* v. *Richardson*, 48 Vt. 508; *Bank* v. *Steward*, 37 Maine, 519; *Luby* v. *Railroad Co.*, 17 N. Y. 131; *Clough* v. *Packing Co.*, 20 Wall. 528; *Hazleton* v. *Union Bank*, 32 Wis. 34; *Randall* v. *Telegraph Co.*, 54 Wis. 140; *Adams* v. *Hanni-*

*bal & St. Jos. Railroad*, 74 Missouri, 553; *Ladd* v. *Couzins*, 35 Missouri, 513; *Bacon* v. *Charlton*, 7 Cush. 581; *Lund* v. *Tyngsborough*, 9 Cush. 36; *Baptist Church* v. *Brooklyn Fire Ins. Co.*, 28 N. Y. 153.

*Mr. B. K. Miller* also filed a brief for defendant in error.

MR. JUSTICE FIELD delivered the opinion of the court.

In October, 1861, the plaintiffs in error, Goetz and Luening, were partners in the business of buying and selling hides on commission, at Milwaukee, Wisconsin. At that time one Du Bois was a dealer in hides at Kansas City, Missouri. On the tenth of that month Du Bois telegraphed to them from Kansas City, inquiring what they could sell four hundred green salt hides for; and what they would advance on a bill of lading of the shipment. The firm answered by telegram, stating the market price of light hides on that day, and that they would pay a draft "for two thirds value, bill of lading attached." On the same day, the firm sent a letter to Du Bois, repeating the message, and adding that if the hides were in good condition and number one, they could sell them readily; that their commission was two and a half per cent.; and that they would sell all hides that he might ship to the market at Milwaukee. Upon this understanding, and during the same month, Du Bois drew upon the firm five drafts, amounting in the aggregate to $9395, which were accepted, and, with the exception of the fifth one, were paid. The fifth one, which was for two thousand dollars, was protested for non-payment. To each of the drafts were attached a bill of lading and an invoice of the shipment. The bill of lading purported to have been issued by the Chicago and Alton Railroad Company, stating that it had received hides, giving the number and estimated weight, to be transported on the road from Kansas City to Milwaukee, and marked and consigned as follows: "To shipper's order. Notify Goetz and Luening, Milwaukee, Wis." The invoice purported to give the net weight in pounds of the hides shipped, and the market price

at Milwaukee, and their estimated aggregate value, referring to the sight draft for two thirds of the amount.

The drafts were made payable to Thornton, the cashier of the Bank of Kansas City, and were cashed as drawn, the bank paying their full face, less the usual rate of exchange on Milwaukee. The amount, as each was cashed, was passed to the credit of Du Bois, and was checked out by him in the usual course of business, within a few days.

The drafts were sent by the bank to its correspondent at Chicago indorsed "for collection" on its account, and by him. were forwarded to Milwaukee. The invoices of some of the shipments were indorsed in the same way. The bills of lading were indorsed by Du Bois, per J. MacLellon, his clerk.

The signatures to the bills of lading proved to be forgeries, on which account Goetz and Luening refused to pay the fifth draft. The bank thereupon brought an action against them for the amount in the Circuit Court of the United States. They defended, and set up as a counter claim the sums they had paid on the four drafts. At the same time, they commenced an action in the State court against the bank to recover the money paid on those four drafts. The latter action was removed, on application of the bank, to the Circuit Court of the United States, where the two actions were consolidated and tried as one, the same questions being involved in both. The trial resulted, by direction of the court, in a verdict for the bank, by which it recovered against the firm the amount claimed on the unpaid draft, and defeated the claim of the firm for the return of the money paid on the other four drafts.

The contention of Goetz and Luening was substantially this, that they accepted the drafts in the belief that the bills of lading were genuine ; that their genuineness was asserted by the indorsement of the bank on the invoices accompanying them ; that the bills of lading were forgeries ; that no shipments as stated therein had been made.; and that Du Bois bore in the community such a reputation for dishonesty, having been charged at other times with forging bills of lading attached to drafts drawn by him, that the bank was guilty

of culpable negligence, amounting to bad faith, in discounting these drafts on the faith of the bills of lading presented by him without inquiring as to their genuineness.

The testimony offered by the firm respecting the character of Du Bois was of great length, but it would serve no useful purpose to discuss it. It is sufficient to say that it consisted of a mass of loose statements, general charges of criminality, with vague references in some instances to reported particulars, sensational articles in newspapers, surmises, insinuations, rumors, beliefs, and suspicions, which might make men cautious in their dealings with him; but they were altogether of too indefinite and uncertain a character to interdict all transactions with him in the ordinary course of business.

Besides, testimony was produced by the bank highly favorable to the standing and character of Du Bois. He is shown to have been a man of great enterprise and capacity; and just before opening business with the bank, to have been a member of the government of Kansas City, representing his ward in the common council, and spoken of as a prominent candidate for its mayoralty. He was a member and director of the board of trade of the city, and one of its committee on arbitration, to which business disputes of its members were referred for settlement. He had been a captain in the Union army, and bore the reputation of a brave and gallant officer. He was received in the best society of the city, and was generally popular. He commenced business with the bank in March, 1881, and drafts by him, cashed by the bank, amounted from twenty to one hundred thousand dollars a month. Those drafts were always accompanied by bills of lading, and not until after the discovery of the forgery of the bills of lading in this case was it known that in any of these transactions he had been guilty of dishonest conduct.

Under these circumstances, it is not suprising that, when the drafts on the merchants in Milwaukee were presented for discount, the bank made no inquiry as to the genuineness of the bills of lading attached to them. A bank in discounting commercial paper does not guarantee the genuineness of a document attached to it as collateral security. Bills of lading

attached to drafts drawn, as in the present case, are merely
security for the payment of the drafts.   The indorsement by
the bank on the invoices accompanying some of the bills, "for
collection," created no responsibility on the part of the bank;
it implied no guarantee that the bills of lading were genuine;
it imported nothing more than that the goods, which the bills
of lading stated had been shipped, were to be held for the pay-
ment of the drafts, if the drafts were not paid by the drawees,
and that the bank transferred them only for that purpose.
If the drafts should be paid, the drawees were to take the
goods.   To hold such indorsement to be a warranty would
create great embarrassment in the use of bills of lading as
collateral to commercial paper against which they are drawn.

The bank after discounting the drafts, stood towards the
acceptors in the position of an original lender, and could not
be affected in its claim by the want of a consideration from
the drawer for the acceptance, or by the failure of such con-
sideration.   This has been held in numerous cases, and was
directly adjudged by this court in *Hoffman* v. *Bank of Mil-
waukee*, 12 Wall. 181, which in essential particulars is similar
to the one at bar.   There the bank had discounted drafts
drawn by parties at Milwaukee on Hoffman & Company, com-
mission merchants of Philadelphia, to which were attached
bills of lading purporting to represent shipments of flour.
Hoffman & Company accepted and paid the drafts.   The bills
of lading proved to be forgeries, and Hoffman & Company
sued the bank to recover the money paid.   It was contended
that they had accepted and paid the drafts in the belief that
the accompanying bills of lading were genuine, and that, had
they known the real facts, they would not have accepted and
paid the drafts, and could not have been compelled to do so,
in which case the loss would have fallen on the bank; that is,
that they paid the drafts under a mistake of facts.   But the
court answered "that money paid as in this case by the ac-
ceptor of a bill of exchange to the payee of the same, or to a
subsequent indorser in discharge of his legal obligation as
such, is not a payment by mistake, nor without consideration,
unless it be shown that the instrument was fraudulent in its

inception, or that the consideration was illegal, or that the facts and circumstances which impeach the transaction as between the acceptor and the drawer were known to the payee or subsequent indorsee at the time he became the holder of the instrument;" that, supposing the plaintiffs accepted the bills of exchange upon the faith and security of the bills of lading attached, that fact would not benefit them, as the bills of exchange were in the usual form, and contained no reference whatever to the bills of lading, and it was not pretended that the defendants had any knowledge or intimation that the bills of lading were not genuine, or that they had made any representation upon the subject to induce the plaintiffs to contract any such liability; that undoubtedly the bills of lading gave some credit to the bills of exchange beyond what was created by the pecuniary standing of the parties to them; but that they were not a part of those instruments, and could not be regarded in any more favorable light than as collateral security accompanying the bills of exchange; and that proof that the bills of lading were forgeries could not operate to discharge the liability of the plaintiffs, as acceptors, to pay the amounts to the payees or their indorsees, as the payees were innocent holders, having paid value for the same in the usual course of business.

The case of *Robinson* v. *Reynolds*, decided by the Queen's Bench, and, on error, in the Exchequer Chamber, 2 Q. B. 196, is also similar, in essential particulars, to the one at bar. An action of assumpsit having been brought by the indorsee of a bill of exchange against the acceptors, they pleaded that the drawer was in the habit of delivering goods in Ireland to the City of Dublin Steam Company to be carried to Liverpool, consigned and deliverable there to his order, and of taking from the company a receipt for the goods, bill of lading, or document, which, by the custom of merchants, when indorsed for value, passed the property in the goods, and entitled the indorsee to have them delivered to him; that the drawer used to obtain advances from the National Bank of Ireland on indorsing to it such document, and drawing and delivering to it a bill of exchange on the defendants or other person to whom

the goods were deliverable; that the bank used to forward the indorsed document to Liverpool, and to have it presented to defendants, (or such other person,) and on the faith thereof, the defendants (or such other person) used to accept the bill of exchange; that the drawer, pretending to act in pursuance of such usage, fraudulently indorsed and delivered to the bank a document in the usual form, to which the signature of the agent of the steam company was forged, purporting that the goods mentioned in it had been delivered to the steam company, which was false; and the drawer, at the same time, indorsed the bill of exchange in controversy to the bank, which advanced him the amount on the faith of the document; that the bank indorsed the document and had it presented to the defendants with the bill of exchange, and requested them to accept the bill of exchange on the faith of, and in consideration of, the delivery of the document, which was delivered as a true one; that the defendants, in consideration of the goods mentioned in the document, and in consideration and on the faith of it, and in ignorance of its being forged, accepted the bill of exchange for and at the request of the bank; and that thus the consideration for the acceptance which defendants had been induced to make under the mistake into which they had been led by the conduct and indorsement of the bank, wholly failed. The plea did not allege that the bank knew the document to be forged or represented it to be genuine; and on that ground, after verdict for the defendants, the plaintiffs, representing the bank, obtained a rule *nisi* for a new trial, or for judgment *non obstante veredicto*. After argument the Queen's Bench made the rule absolute. In giving its decision Lord Denman said : " This plea does not show that the plaintiffs made any representation which they knew to be false, nor that they warranted the bill of lading to be genuine : nor does it disclose that the defendants accepted the bill of exchange on which the action is brought upon the faith of any assertion by the plaintiffs, further than their indorsement upon it, that the bill of lading, which turned out to be forged, was genuine. On the contrary, it appears by the other averments in the plea that the drawer of the bill was the correspondent of the

defendants, and that it was upon his authentication of the bill of lading, as referring to goods which he professed to have consigned to them, that they acted." Judgment was accordingly ordered for the defendant, *non obstante veredicto*.

The case having been taken to the Exchequer Chamber, the judgment of the Court of Queen's Bench was affirmed. Tindal, C. J., in delivering the opinion of the court, said: "The sole ground on which the defendant relies is, that the acceptance was not binding on account of the total failure or insufficiency of the consideration for which it was given, the document, on the delivery of which the acceptance was given, having been forged, and there never having been any other consideration whatsoever for the acceptance of the defendants. And this would have been a good answer to the action, if the bank had been the drawers of the bill. But the bank are indorsees, and indorsees for value; and the failure or want of consideration between them and the acceptors constitutes no defence; nor would the want of consideration *between the drawer and acceptors* (which must be considered as included in the general averment that there was no consideration), unless they took the bill with notice of the want of consideration, which is not averred in this plea. Admitting that the bill was accepted by the drawee at the request of the bank, and on a consideration which turns out to be utterly worthless, the case is the same as if the bill had been accepted without any value at all being given by the bank to the defendants; and, on that supposition, the defendants would still be liable as acceptors to the bank, who are indorsees for value, unless not only such want of consideration existed between the drawer and acceptors, but unless the indorsees had notice or knowledge thereof. For the acceptance binds the defendants conclusively, as between them and every *bona fide* indorsee for value. And it matters not whether the bill was accepted before or after such an indorsement."

Many other cases to the same purport might be cited. *Craig* v. *Sibbett*, 15 Penn. St. 238, 240; *Munroe* v. *Bordier*, 8 C. B. 862; *Thiedeman* v. *Goldschmidt*, 1 De Gex. F. & J. 4; *Hunter* v. *Wilson*, 19 L. J. N. S. Exch. 8; *Leather* v. *Simpson*, 11 L. R. Eq. 398.

The bad faith in the taker of negotiable paper which will defeat a recovery by him must be something more than a failure to inquire into the consideration upon which it is made or accepted, because of rumors or general reputation as to the bad character of the maker or drawer.

The main position of the plaintiffs in error is, therefore, untenable. It only remains to say a few words respecting the exceptions to the rejection and admission of testimony.

1. Articles from newspapers touching the conduct of Du Bois in drawing drafts, with alleged fictitious bills of lading attached, on a house in Buffalo two years before, were excluded as having no connection with the transactions in controversy, and it not appearing that the officers of the bank ever saw them; and we think the exclusion was correct. The story of his conduct two years before in a different transaction, however bad or even criminal it may have been, did not show, or tend to show, bad faith in the officers of the bank in discounting the drafts in this case.

2. The testimony of one of the plaintiffs and of one of his attorneys was offered as to declarations of the president of the bank, made several days after the last draft had been discounted, to the effect that the bank had become largely involved in certain wool transactions with Du Bois as early as July or August, 1881, and would have broken off its relations with him if it had not been that this wool matter remained unsettled. The testimony was excluded, and rightly so. The declarations had no bearing upon the good faith of the officers of the bank in the transactions in this case; and, if they had, being made some days after those transactions, they were not admissible as part of the *res gestæ* any more than if made by a stranger. Evidence of declarations of an agent as to past transactions of his principal are inadmissible, as mere hearsay. *Luby* v. *Hudson River Railroad,* 17 N. Y. 131, 133 ; *Adams* v. *Hannibal and St. Joseph Railroad,* 74 Missouri, 553.

3. The testimony of the president of the bank, explanatory of the conduct of its officers when certain drafts came back protested, was admissible. The witness had testified, upon examination by the plaintiffs, that the bank never had any

knowledge of a forged bill of lading by Du Bois until October 31, 1881; and that it was not a fact that he had purposely remained ignorant of the facts and circumstances attending the protests of certain other drafts of Du Bois, to which bills of lading were attached, which the bank had discounted. and that he could only explain why no particular pains were taken in the matter by stating what the usage of the bank was in such matters. As the witness was about to state such usage, the counsel of the plaintiffs interrupted him, and called his attention to the question put, whether any special pains had been taken, but the court said, let him state the usage as to such papers. The witness then answered as follows: "No, sir; I did not take any special pains, for the reason that it is a matter of very common occurrence. A merchant will ship a lot of grain to New York, the drafts come there, and for some reason a commission merchant won't pay them; it may be that he is not in a position to do it; it may be he thinks they are drawn for too much, and he refuses to pay; the drafts come back, or are held under directions of the bank for settlement or other arrangement. That is a very common occurrence on shipments with bills of lading attached." There could be no just objection to the court's receiving this explanation.

We see nothing in the other exceptions which requires notice.

*Judgment affirmed.*