SPRINGS et al. v. HANOVER NAT. BANK OF CITY OF NEW YORK.

(Supreme Court, Trial Term, New York County. February 1, 1911.)

BANKS AND BANKING (§ 148*)—DRAFTS—COLLECTION—FORGED COLLATERALS.
　　Plaintiffs agreed for shipment of cotton by a cotton company; plaintiffs to advance 85 per cent. of its value pending its sale, and the cotton company to draw on them for that amount. The draft was delivered to a bank for collection, which discounted it, and forwarded it to defendant bank with the bills of lading attached, and defendant, as agent for the other bank, received payment from plaintiffs; neither bank having knowledge that the bills of lading were forged and represented no actual shipment. *Held*, that plaintiffs could not recover from defendant the amount of the draft on the ground that it was paid through a mistake of fact, in that plaintiffs believed that the bills of lading attached to the draft were genuine; the defendant being only the agent of the discounting bank, and that bank being a bona fide holder for value.
　　[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 438–452; Dec. Dig. § 148.*]

Action by Richard A. Springs and others against the Hanover National Bank of the City of New York. On motion to set aside a verdict for plaintiffs and grant a new trial. Motion granted.

John R. Abney, for plaintiffs.
Percy S. Dudley (Charles F. Brown, of counsel), for defendant.

NEWBURGER, J. Knight, Yancey & Co. were a firm of cotton dealers carrying on quite an extensive business at Decatur, Ala., and until April, 1910, when they went into bankruptcy, bore a good reputation and stood high in the community. The plaintiffs are engaged in the buying and selling of cotton in New York. The defendant is incorporated under the national bank act, and is carrying on business in this city. The First National Bank of Decatur, Ala., is located at that place. Knight, Yancey & Co. did business with the First National Bank of Decatur for many years; the transactions consisting of the discounting of drafts, with and without bills of lading, and amounting to millions of dollars. They had also done some business with plaintiffs. In January, 1910, Knight, Yancey & Co. had some corre-

spondence with plaintiffs as to the terms upon which they could handle cotton shipped to them in New York. On March 29, 1910, the following telegrams were exchanged:

"Exhibit A. Birmingham, Ala., 29. Springs & Co., N. Y.: We are consigning you some spots for delivery. Please advise shipping and drawing instructions. K., Y. & Co.

"Exhibit B. March 29, 1910. Knight, Yancey & Co., Birmingham, Ala.: Ship as you think best. You may draw relics (85) per cent. on value you insure until warehoused. Springs & Co.

"Exhibit C. Birmingham, Ala., March 29. Springs & Co., N. Y. C.: Have shipped you to-day six hundred bales care Independent Stores, drew thirty-nine thousand. K., Y. & Co."

On March 29, 1910, Knight, Yancey & Co. presented to the Decatur Bank their draft in the following form:

"Exhibit 1. Mar. 29, 1910, 19.... No. 4059. Knight, Yancey & Co. Cotton. Decatur, Ala. 205A. Pay to the order of W. B. Shackelford, cashier, $39,000 (thirty-nine thousand dollars) for value received and charge same to account of Knight, Yancey & Co. To Springs & Co., New York, N. Y."

They presented with the draft what purported to be bills of lading and certificates of insurance for 600 bales of cotton. This draft was discounted by the Decatur Bank and credited to the account of Knight, Yancey & Co., less the usual charges, and the proceeds were checked out by them the same day. On the same day the Decatur Bank indorsed the draft, "Pay to the order of Hanover National Bank, New York, N. Y. (All prior indorsements guaranteed.) The First National Bank, Decatur, Ala. W. B. Shackelford, cashier," and mailed it to the defendant inclosed in a printed form "for collection and credit," and the only reference to the bills of lading being, "P. A.," meaning papers attached. This letter, with inclosures, was received by defendant on March 31, 1910. The draft with the papers attached was sent by messenger in the usual way to the plaintiffs for payment. Upon presentation to the plaintiffs and after an examination by them of the papers, which appeared to be in proper form, and in accordance with the telegrams that had passed between them and Knight, Yancey & Co., plaintiffs gave their check for $39,000 to the messenger of the defendant. This amount was credited by the defendant upon its books to the Decatur Bank on March 31st, and drawn out in the ordinary course of business by the Decatur Bank by April 4, 1910. The draft contained no reference to the bills of lading or certificates of insurance, and neither the Decatur Bank nor defendant indorsed either the bills of lading or certificates of insurance. On the 13th day of May, 1910, the plaintiffs informed the defendant that they had not received the cotton and demanded repayment of the $39,000, stating that they believed the bills of lading to be forgeries. This demand was subsequently repeated, and the papers were tendered by plaintiffs to the defendant, but payment refused. There is no dispute that the signatures on the bills of lading are forgeries, and that no cotton as described was received by the respective railroads. The testimony of plaintiffs' witnesses was in effect that in paying the draft they relied on all the papers, believing the bills of lading to be genuine and valid, and that they would not have paid the draft if the bills of lading had not been

attached. There is no question that the draft itself was genuine and the amount correct, and that plaintiffs intended to accept and pay such a draft; the plaintiffs' witness, Accosta, stating that the collateral, namely, the cotton, was sufficient to cover the amount of the draft. It is not claimed that either the Decatur Bank or the defendant had any knowledge that the bills of lading were forgeries, nor any dispute that the Decatur Bank and the defendant were holders in good faith and for value. This action is not brought on the draft, the bills of lading, or the certificates of insurance, but is brought to recover money paid by mistake of facts on the part of plaintiffs when they paid the same. At the trial both parties moved for a direction of a verdict, and the court granted the plaintiffs' motion and directed a verdict for $39,910. Exceptions were duly taken by the defendant, and the motion for a new trial upon all the grounds stated in section 999 of the Code of Civil Procedure is now entertained.

It is apparent that the only mistake of fact involved in this case is that both banks and the plaintiffs believed that the bills of lading accompanying the draft for $39,000 represented actual cotton; whereas, they were forged. In 2 Daniel, Negotiable Instruments, § 1734d, it is said:

"It is not the duty of a party discounting a bill of exchange to inquire into the genuineness of a bill of lading accompanying it in order to hold another bound by a letter of credit which authorizes the bill of exchange to be drawn upon the letter writer provided it be accompanied by the bill of lading, and if the letter writer pay the bill of exchange and afterward discovers that the bill of lading is forged he cannot recover back the money on the ground of mistake of fact. And the acceptor of a bill of exchange discounted by a bank, with a bill of lading attached which the acceptor and the bank regarded as genuine at the time of acceptance, but which was in fact a forgery, has been held bound to pay the bill at maturity."

The plaintiffs rely upon the well-settled rule in this state that a party is entitled to recover back moneys paid upon forged drafts or bills, but none of the cases cited can be applied to this case. It would appear, however, that the decisions of the English courts and the Supreme Court of the United States have uniformly held that money paid upon a draft properly drawn, but accompanied by forged bills of lading, when paid by the drawee cannot be recovered back. In Robinson v. Reynolds, 2 Q. B., Adolphus & Ellis, N. S., 196, decided by the Exchequer Chamber in 1841, a man named Keegan discounted a draft with what purported to be bills of lading attached at Reynolds' bank, which sent the draft to Robinson with the bills of lading attached which it had indorsed. Robinson accepted the draft in ignorance of the fact that the bills of lading were spurious. Reynolds' bank brought suit to compel payment of the acceptance, and Robinson defended on the ground that the acceptance was made under a mistake into which he had been led by the conduct of the bank. A verdict in favor of Robinson was set aside by the Court of Queens Bench and an appeal was then taken to the Exchequer Chamber. It was there held that the sole defense was failure of consideration, and that this was not available as against an indorsee for value, as Reynolds' bank was. Admitting that the bill was accepted at the request of the bank and that the consideration was worthless, the case was the same as if the bill had been ac-

cepted without any value given by the bank, and yet the acceptor would still be liable unless the indorsee bank had notice. In Thiedemann v. Goldschmidt, 1 De Gex, F. & J., 4, decided in 1859 on appeal from the vice chancellor, heard before Lord Chancellor Campbell and the Lords Justices, Thiedemann, a merchant in Newcastle, England, authorized a correspondent, Homeyer, of Prussia, to draw on him against bills of lading for wheat. Homeyer drew bills and attached what purported to be bills of lading for wheat and discounted the drafts in Berlin. The drafts were forwarded to England and accepted by the Union Bank of London under instructions from Thiedemann; that bank having received what it believed to be genuine bills of lading. The drafts were paid to Goldschmidt, the correspondent of the Berlin bank. About two weeks later the bills of lading were discovered to be forgeries. The Lord Chancellor said:

"I think that dangerous consequences would follow and the credit of bills of exchange be very much shaken if the title of the indorsees of bills of exchange as against the acceptor, under such circumstances, could be called in question. It is allowed that the case of Robinson v. Reynolds was well decided, that its authority has never been questioned, and that it is part of the commercial law of England."

In the case before them, as well as in Robinson v. Reynolds, the discounting banks were bona fide holders for value, and their right to keep the money which they had received could not be disputed. See, also, Woods v. Thiedemann, 1 Hurl. & C., 478; Leather v. Simpson, 11 L. R. Eq., 398, decided in 1871.

In Hoffman v. Bank of Milwaukee, 79 U. S. 181, 20 L. Ed. 366, a consignor, who had been in the habit of drawing bills of exchange on his consignee with bills of lading attached to the drafts drawn (it being part of the agreement between the parties that such bills should always attend the drafts), drew bills on him with forged bills of lading attached to the drafts, and had the drafts with the forged bills of lading so attached discounted in the ordinary course of business by a bank ignorant of the fraud. The consignee, not knowing of the forgery of the bills of lading, paid the drafts. It was held that there was no recourse by the consignee against the bank. It was usual for the consignor to write a letter to the consignee at the time of drawing informing the consignee of the shipment and asking him to accept the draft which the consignee replied to, promising to accept the draft. In that case the Milwaukee bank forwarded the drafts with the bills of lading attached to the National Park Bank of New York, which in turn forwarded the same to the Commonwealth Bank of Philadelphia, and the latter presented the draft with bill of lading to the drawees, Hoffman & Co., who, knowing the drafts to be genuine, and not supposing that the bills of lading were otherwise, paid the drafts to the Philadelphia bank, which remitted the money back to the Park Bank to the credit of the Milwaukee bank. No flour being received, Hoffman & Co. discovered the forgery, and the drawers, being insolvent, sued the bank of Milwaukee. The declaration was for money paid by mistake of fact, the mistake being that the bills of lading were forged; whereas, the plaintiffs believed them to be genuine. Clifford, J., stated the general rules of law and the facts in this case and said:

"Money paid under a mistake of facts, it is said, may be recovered back as having been paid without consideration; but the decisive answer to that suggestion, as applied to the case before the court, is that money paid, as in this case, by the acceptor of a bill of exchange to the payee of same or to a subsequent indorsee in discharge of his legal obligation as such, is not a payment by mistake nor without consideration, unless it be shown that the instrument was fraudulent in its inception or that the consideration was illegal or that the facts and circumstances which impeach the transaction as between the acceptor and the drawer were known to the payee or subsequent indorsee at the time he became the holder of the instrument (citing English cases). Such an instrument, as between the payee and the acceptor, imports a sufficient consideration, and in a suit by the former against the latter the defense of prior equities as between the acceptor and the drawer is not open unless it be shown that the payee at the time he became the holder of the instrument had knowledge of those facts and circumstances. Attempt is made in argument to show that the plaintiffs accepted the bills of exchange upon the faith and security of the bills of lading attached to the same at the time the bills of exchange were discounted by the defendants. Suppose it was so, which is not satisfactorily proved, still it is not perceived that the concession, if made, would benefit the plaintiffs, as the bills of exchange are in the usual form and contain no reference whatever to the bills of lading, and it is not pretended that the defendants had any knowledge or intimation that the bills of lading were not genuine, nor is it pretended that they made any representation upon the subject to induce the plaintiffs to contract any such liability. They received the bills of exchange in the usual course of their business as a bank of deposit and paid the full amount of the net proceeds of the same to the drawers, and it is not even suggested that any act of the defendants, except the indorsement of the bills of exchange in the usual course of their business, operated to the prejudice of the plaintiffs or prevented them from making an earlier discovery of the true character of the transaction. On the contrary, it distinctly appears that the drawers of the bills of exchange were the regular correspondents of the plaintiffs, and that they became the acceptors of the bills of exchange at the request of the drawers of the same and upon their representations that the flour mentioned in the bills of lading had been shipped to their firm for sale under the arrangement before described. Beyond doubt the bills of lading gave some credit to the bills of exchange beyond what was created by the pecuniary standing of the parties to the same; but it is clear that they are not a part of those instruments, nor are they referred to either in the body of the bills or in the acceptance, and they cannot be regarded in any more favorable light for the plaintiff than as collateral security accompanying the bills of exchange."

The rule laid down in this case was approved of and followed in Goetz v. Bank of Kansas City, 119 U. S. 551 (1886) 7 Sup. Ct. 318, 30 L. Ed. 515. Mr. Justice Earl, in Southwick v. First Nat. Bank of Memphis, 84 N. Y. 433, says:

"The only other theory suggested for the maintenance of this action is that of mistake, and much can be plausibly and forcibly said in favor of this theory. It is certainly true that if the drawees had known what they now know, or if they had known that the proceeds of the draft were to be applied otherwise than upon the old draft, they would not have accepted or paid the draft. But were they so mistaken that they can reclaim the money voluntarily paid by them? It is not every mistake that will lay the groundwork for relief. It must be a mistake as to some existing fact, not as to something to happen or to be done in the future. It must be a mistake as to some fact not remotely, but directly, bearing upon the act against which relief is sought. Dambmann v. Schulting, 75 N. Y. 55. If it were the rule to relieve against mistakes as to remote or what are sometimes called extrinsic facts, great uncertainty and confusion would attend business transactions. Here the draft was genuine, addressed to the drawees, who had authorized it to be drawn,

and it was held by the defendant, which could lawfully receive payment thereof. There was no mistake as to the intrinsic facts. The facts that the drawers had not acted in good faith with the drawees or had placed the draft and its proceeds beyond their control, so that the old draft might not be paid, were too remote. The mistake of the drawees was rather as to the application of the money paid by them—a future act. If the defendant had received this money and applied it upon the old draft, the precise expectation of the drawees would have been met, and there would have been no ground of complaint. It is believed that no case can be found which holds that a party paying money under the circumstances existing here has been allowed to reclaim it upon the ground of mistake."

In Grotian v. Guaranty Trust Co. (C. C.) 105 Fed. 566, cited by plaintiffs' counsel, in which the court overruled the demurrer interposed by the defendant, the draft charged the amount to the account of 8417 bushels of flaxseed, and Mr. Justice Wheeler, in his opinion says:

"Here the property covered by the bill of lading was mentioned in the draft and in the acceptance and affected their meaning. The draft was to be charged to the account of the flaxseed. The acceptance was not absolute, but was against the flaxseed and insurance. As the acceptance was qualified by being against the bill of lading, the flaxseed, and the insurance, there would be no liability upon it without any of them. The forged bill of lading was as nothing."

It is apparent that the transaction for the cotton was between Knight, Yancey & Co. and Springs & Co., the plaintiffs herein. The telegrams between them were to the effect that Knight, Yancey & Co. were to ship cotton to the plaintiffs, who were to advance 85 per cent. of its value pending its sale on the New York market. It was also understood that Knight, Yancey & Co. might draw on the plaintiffs for such advance. Plaintiffs were not interested whether Knight, Yancey & Co. delivered the draft to the Decatur Bank for collection or had the same discounted, and the draft did not represent the full value of the cotton to be shipped. The defendant received the draft with the bills of lading and certificates of insurance from the First National Bank of Decatur, who, by reason of having discounted the draft, was a bona fide holder for value, and in presenting to the plaintiffs and receiving payment therefor the defendant acted as the agent of the Decatur bank. It furthermore appears that neither the defendant nor its principal had knowledge that the bills of lading or certificates of insurance were forged. The defendant's authority was to simply collect the amount of the draft. It did not guarantee the validity of the collateral or that the cotton would be delivered. It also appears that Knight, Yancey & Co. became bankrupt on April 19th, three weeks after the payment by the plaintiffs of the draft and 15 days after the Decatur bank had drawn the balance in the hands of the defendant, and almost one month before the plaintiffs notified the defendant of the nonarrival of the cotton.

For the reasons here stated, the motion to set aside the verdict must be granted, and a new trial ordered.