# CASES

# SUPREME COURT

OF

# WASHINGTON

[No. 17699.   Department One.   May 14, 1923.]

CHASE NATIONAL BANK OF THE CITY OF NEW YORK,
*Respondent*, v. SPOKANE COUNTY, *Appellant*.[1]

TAXATION (2-1, 28)—POWER OF STATE—PROPERTY OF NATIONAL
BANKS. The states have no power under the National Banking Act,
U. S. Rev. Stat., § 5219, to levy any taxation upon any property of
a national bank other than its capital stock; and it is wholly im-
material whether the bank is transacting business outside the state
of its domicile, or whether the property is located and taxed in such
other state.

BILLS AND NOTES (35-2)—CARRIERS (14-2)—BILLS OF LADING—IN-
DORSEMENT OR TRANSFER—TITLE TO GOODS. · Where a bank purchases
drafts, with bill of lading attached, it does not become the absolute
owner of the property covered by the bill, but only acquires a
special property therein for the purpose of security, in the absence
of an intention of the parties to the contrary.

BANKS AND BANKING (36, 38)—PROPERTY AND CONVEYANCES—EF-
FECT OF ACTS ULTRA VIRES. Where it is an act *ultra vires* for a na-
tional bank to purchase personal property covered by a bill of lad-
ing, it will not be presumed that it intended to do so when it pur-
chased drafts, with the bill of lading attached; and the question of
*ultra vires* may be raised by parties other than the United States,
to the extent of indicating the intent of the parties.

CARRIERS (14-2)—BILLS AND NOTES (35-2)—BILLS OF LADING—
TRANSFER—TITLE TO GOODS—CONTRACT—CONSTRUCTION. Where auto
trucks, covered by bills of lading attached to drafts discounted by
a national bank, never came into the possession of the consignee,

[1]Reported in 215 Pac. 374.

who became insolvent, the absolute title to the trucks was not vested in the bank by a written agreement between the bank and the receiver for the insolvent authorizing the receiver to sell the trucks, which contract recited that the title was to remain in the bank, when it appears that the drafts were discounted by the manufacturer borrowing money from the bank, which took the bills of lading as security for the advances, and if a draft was not paid, it was charged back to the manufacturer, and the bill of lading returned.

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered September 6, 1922, upon findings in favor of the plaintiff, in an action to recover a tax paid, tried to the court. Reversed.

*William C. Meyer* and *Albert H. Sundahl,* for appellant.

*Wakefield & Witherspoon,* for respondent.

BRIDGES, J.—The validity of a tax, levied by the authorities of Spokane county, in this state, against certain personal property, is the only question involved in this appeal.

Chronologically, the facts are as follows: The Bethlehem Motors Corporation, of Pennsylvania, sold eight auto trucks to the Northwestern Auto Company, of Portland, Oregon, for shipment to Spokane. These were shipped according to program. The Motors Corporation drew two drafts on the Northwestern Auto Company, one dated June 14, 1920, and the other June 30, 1920, for the total purchase price of the trucks. These drafts were made payable to the respondent, Chase National Bank of the City of New York. Attached to the drafts were the bills of lading. The respondent purchased these drafts, paying the full amount thereof, and credited the account of the Motors Corporation therewith. The respondent forwarded the drafts and bills of lading to its correspondent at Portland, for collection. The Northwestern Auto Company

failed or refused to pay the drafts and they were returned, together with the bills of lading, to the respondent. In August, 1920, a receiver was appointed for the Motors Corporation. On September 3, 1920, the railroad still having possession of the trucks, warehoused them in the city of Spokane, and on September 22, 1920, a written arrangement was made between the respondent and the receiver of the Motors Corporation whereby the latter was to undertake to sell the trucks for the account of the respondent. On March 9, 1921, the trucks were assessed for general taxes as the property of the Motors Corporation. They were then in the warehouse where they had previously been put. The receiver, being advised of the assessment, wrote the appellant that he had no interest in the trucks and that they belonged to the respondent. On April 30, 1921, the respondent paid the taxes under protest, because the public officers of the appellant were threatening to distrain and sell the trucks for the taxes. Later it brought this action to recover the amount so paid. The lower court found that, at the time of the taxation, the trucks belonged to, and were the property of, the respondent, and concluded therefrom that the taxes were illegal, and entered judgment for the respondent.

The respondent contends that it owned the trucks at the time they were taxed, and that it being a national bank, incorporated and doing business under and by virtue of the national banking act, the appellant had no authority to levy the tax. On the contrary, the appellant contends that the respondent was at no time the owner of the property, and that, even it it were, it was doing business outside of the state of its principal place of business (which was New York), and any of its personal property found in this state was subject to taxation; and that, in any event, under the national

banking act, it had no power to acquire the ownership of these trucks, and for that reason they were taxable here.

It has long since been a well established rule that states are entirely without power to levy any taxes, directly or indirectly, upon national banks, or any of their property, except such as Congress has expressly authorized. Section 5219, U. S. Rev. Stats., being a part of the national banking act, authorizes the various states to tax the capital stock of national banks and their real estate.

In *Owensboro National Bank v. City of Owensboro*, 173 U. S. 664, the court, speaking of this provision of the statute, said:

"This section, then, of the Revised Statutes is the measure of the power of a State to tax national banks, their property or their franchises. By its unambiguous provisions the power is confined to a taxation of the shares of stock in the names of the shareholders and to an assessment of the real estate of the bank. Any state tax therefore which is in excess of and not in conformity to these requirements is void."

This court, in the case of *Dexter Horton National Bank v. McKenzie*, 69 Wash. 314, 124 Pac. 915, recognizes the principles laid down in the case last cited by saying:

"However that may be as to state banks, the state has no power to tax national banks except to tax their real estate and their shares of stock, this being the only concession made by the national government to the states upon that subject."

See, also: *First National Bank of Albuquerque v. Albright*, 208 U. S. 548; 37 Cyc. 830; 26 R. C. L. 85.

The principle which we are discussing is so well established that we deem it unnecessary to cite more of the cases.

The fact that the trucks which were taxed happened to be in the state of Washington and the fact that the respondent was indirectly transacting business outside of the state of its principal place of business, cannot affect the question under discussion. Whatever interest the respondent acquired in the trucks was acquired through a transaction had at its principal place of business in New York. We conclude, therefore, that, if the respondent was the owner of the trucks, the appellant was without any authority to tax them.

But, to our mind, the more serious question is whether respondent was such an owner of the trucks as deprived the appellant of power to tax them.

The respondent, in its brief, asserts its ownership because "title to the trucks vested in respondent immediately upon the discount of the drafts and the endorsement of the bills of lading." After supporting the foregoing assertion with argument and authorities, it says: "But it is unnecessary to determine whether the legal title thus transferred was absolute and unqualified in respondent from the moment of discount and endorsement. If the property was special at that juncture, it became absolute when the Northwestern Auto Co. refused payment of the drafts." In support of these assertions, it cites: *Commercial Bank of Port Huron v. Elliott,* 92 Wash. 357, 159 Pac. 377, and *Wickens v. Scheuer,* 118 Wash. 614, 204 Pac. 780, as decisive in this jurisdiction, and the following cases from other jurisdictions: *American Thresherman v. Citizens' Bank of Anderson,* 154 Wis. 366, 141 N. Y. 210; *Fourth National Bank of Montgomery v. Bragg,* 127 Va. 47, 102 S. E. 649, 11 A. L. R. 1034; *Gibson v. Stevens,* 8 How. (U. S.) 384; 10 C. J. 204; 4 Am. & Eng. Ency. Law 548; *Third National Bank of St. Louis v. Hays,* 119 Tenn. 729, 108 S. W. 1060; *Farmers' &*

*Merchants' National Bank v. Sprout,* 104 Kan. 348, 179 Pac. 301.

In the case of *Vickers v. Machinery Warehouse & Sales Co.,* 111 Wash. 576, 191 Pac. 869, we held that, where a shipper drew a draft and attached it to a bill of lading covering the goods shipped and discounted the draft at a bank, and the proceeds were put to his credit, the bank became the absolute owner of the draft and the unqualified owner of the proceeds to be collected therefrom.

We do not think the case of *Commercial Bank of Port Huron v. Elliott, supra,* from this court, supports the contention of the respondent. There the facts were that the bank discounted a sight draft with bill of lading attached, and before the draft was paid, another party attached the property covered by the bill of lading. We said:

"The court correctly held as a matter of law that the bank, by reason of owning the bill of lading, had a right to all property covered by this bill of lading, superior to appellant whose only claim to the property was by virtue of a subsequent attachment."

This case would seem to be better authority for the proposition that, when a bank purchases a draft, taking a bill of lading attached thereto, it takes the property covered by the latter as security for the payment of the draft, than for the assertion that the bank, by the transaction, became the absolute owner of the property involved.

Nor do we consider that the case of *Wickens v. Scheuer, supra,* from this court, is conclusive here. The facts are rather complicated and we will not undertake to state them fully, but there were involved the issuance by a bank of letter of credit and the purchase by it of a draft, attached to which was a bill of lading. We said:

"It is contended by appellant that the transaction is simply a purchase of goods by Scheuer (one of the respondents) with a pledge of title to the respondent banks as security, and that, the legal title being in Scheuer, the goods would be subject to attachment for debts owing by them.

"The effect to be given to an indorsement of a bill of lading depends upon the intention of the parties. And where the title is intended to be passed, this will be the effect of the transaction."

The court then proceeds to arrive at the intention of the parties as disclosed by the fact that the bill of lading was attached to the draft, by the language of the letter of credit and by the provision for insurance, and states that these things "satisfy us that it was the intention of the parties to vest title in the banks advancing the money," and it was held that the attachment would not lie.

These two cases from this court go no farther than to hold that the bank holding the bill of lading had a better and superior right in the property covered by the bill of lading than an attaching creditor, and this view is in line with most of the authorities and cases on the subject.

In *American Thresherman v. Citizens' Bank of Anderson, supra,* it was held that, where a bank purchased a draft to which was attached a bill of lading, and the proceeds were deposited to the credit of the person drawing the draft, "the title to the property covered by the bill of lading passes to the bank when the discount occurs and the bill of lading is transferred, so that it is no longer subject to attachment for the seller's debts." This was another attachment case.

The facts in the case of *Fourth National Bank of Montgomery v. Bragg, supra,* were that the bank purchased the draft with bills of lading attached and forwarded them for collection. When the amount of the

draft was paid to the collecting bank, the proceeds were attached by Bragg as the property of the drawer of the draft. The court held that the money belonged to the bank and was not subject to attachment or garnishment, thereby following the same line of reasoning followed by this court in the *Vickers* case, *supra*. Although the question whether the transfer of the bill of lading vested title of the goods covered by it was not there included, yet the court, in its general discussion of the main question, states that the bank became the owner of the goods covered by the bill. It was not necessary to the decision of the case to determine who was the owner of the goods.

Expressions may be found in a good many cases to the effect that, under the circumstances existing in the case at bar, the taker of the bill of lading obtains title to the property covered thereby. Some of the cases so holding are the following (in addition to those cited by respondent): *Walsh, Boyle & Co. v. First National Bank of Hiawatha*, 228 Ill. 446, 81 N. E. 1067; *First National Bank of Kansas City v. Mt. Pleasant Milling Co.*, 103 Iowa 518, 72 N. W. 689; *Marine Bank of Chicago v. Wright*, 48 N. Y. 1. Indeed, a few cases have gone so far as to hold that the purchaser of a draft with bill of lading attached, so far becomes the owner of the property shipped as that he steps into the shoes of the shipper and is liable in damages or otherwise to the purchaser to the same extent that the shipper would have been. *Haas v. Citizens Bank of Dyersburg*, 1 L. R. A. (N. S.) 242, and cases therein cited. But the great weight of authority has entirely repudiated this doctrine. See note to case last cited.

Generally speaking, in the cases where it is said that, when a bank purchases a draft with bill of lading attached, it becomes the owner of the property covered

by the bill of lading, it will be found that the goods have been attached by some third person as the property of the shipper, or the money paid in discharge of the draft has been garnished. In our cases, heretofore cited, we have held that such attachments or garnishments could not affect the rights of the bank.

We do not deny that a bill of lading may be transferred under such circumstances as to conclusively show that the intention was that the shipper's title to the property covered by the bill of lading should vest in the transferee; but where, as here, a bank has bought the draft of the shipper and the bill of lading is attached, it seems to us manifest that the bank does not become the absolute owner of the property covered by the bill of lading—in other words, does not become a common purchaser of the property, but does acquire some kind or character of special property, claim or lien upon that property to protect it in the payment of the draft which it had purchased. Whatever interest it has is held only as security.

Some of the authorities hold that, by taking the bill of lading, the bank acquires a "special property" in the thing covered by the bill of lading for the purpose of protection or security. Others hold it thereby acquires a "lien or security" to protect its draft. 4 R. C. L. 33, says:

"A well established custom has grown up in commercial circles by which bills of lading as the symbols of title to the property in transit, are taken as security for money advanced, and indorsed and delivered as a transfer of the property, generally in connection with, and as security for, the payment of drafts attached thereto. . . . Such transfer of the bill of lading is regarded as equivalent to investing the pledgee with the actual possession of the property, and as long as he retains the possession of the property, either actual or symbolical. . . It is a well established rule of

law that after the holder of a negotiable draft with bill of lading attached has secured an acceptance of such draft from the drawee and consignee, he is unaffected by any equities originally existing between such consignee and the original seller of the goods. . . It has been said that a special property passes to the transferee when a bill of lading with draft attached is delivered subject to be divested by the acceptance and payment of the draft; but until the draft is accepted and paid the possession of the transferee is good as against all parties. Opposed to the great weight of authority there are some cases holding that a transfer of bill of lading with a draft attached operates as a complete and absolute transfer of the goods and places the transferee in the position of the drawer in every respect.''

In note 56, 7 C. J. 716, many authorities are cited in support of the assertion that ''If a draft to which a bill of lading properly indorsed, is discounted by a bank, a special property in the merchandise described therein passes to the bank as security, which is preserved until the draft is accepted and paid.''

See, also, the following cases to the same general effect: *Old National Bank of Waupaca v. People's Bank of Harrisville,* 89 W. Va. 132, 108 S. E. 716, 18 A. L. R. 728; *Lewis v. Small & Co.,* 117 Tenn. 153, 96 S. W. 1051, 6 L. R. A. (N. S.) 887; *Means v. Bank of Randall,* 146 U. S. 620, 36 L. Ed. 1107; *Goetz v. Bank of Kansas City,* 119 U. S. 551, 30 L. Ed. 515. In addition to the authorities to be found in the cases cited, see extensive note to the case of *American Thresherman v. Citizens' Bank of Anderson, supra.*

After all, this court probably stated the doctrine correctly in the case of *Wickens v. Scheuer, supra,* when it was said that whether the purchase of a draft, with the bill of lading attached, will transfer the absolute title to the property depends upon the intention of the parties. If we adopt that rule as a guide, it

seems that we must hold that, in this instance, it was not the intention of the parties to vest in the respondent the absolute title to the property covered by the bill of lading.

It is unnecessary to cite authorities in support of the statement that a national bank has absolutely no power to buy, trade and deal in ordinary personal property, and that it acts *ultra vires* when it so does. Of course, this is not to say that a national bank may not, under some circumstances, become the owner of ordinary personal property. Unquestionably, such ownership is authorized where it is obtained for its financial protection and its taking grows out of legitimate transactions. Such a bank may take a mortgage or pledge upon personal property, and if for its protection it is required to take over the property, the law will not forbid such act. If we accept the argument advanced by respondent, then it seems to logically follow that the bank here actually purchased these eight auto trucks, a transaction directly in violation of its authorized powers. It will not, therefore, be presumed that the bank intended to take the title to the property in violation of statute. On the contrary, it will be presumed that whatever interest it took in the trucks was for security only, or, as some authorities hold, a "special property." But probably this special property is nothing more than a pledge or mortgage or other kind of security with the exclusive right of possession.

If it be said that only the United States government may raise the question of *ultra vires,* our answer is that appellant has a right to raise it in so far as it tends to indicate the intention of the parties when the bill of lading was taken.

As before noted, the state has no authority to tax the personal property of a national bank. But this

must mean such property as is owned entirely and exclusively by the bank, and not such as it may hold for the purpose of security. Our view, then, is that, by purchasing the draft with the bill of lading attached, the respondent did not become such an owner of the property covered by the bill of lading as deprived the authorities of the county of the right to tax it. It is not necessary for us to decide the exact character of the interest which the respondent acquired in the trucks—whether it was in the nature of a mortgage, pledge, or other kind of security. What we do hold is that, whatever its interest, it was held merely for security and that it did not become the unconditional owner.

It is shown (although respondent lays no stress upon the fact) that, after the receiver for the Motors Corporation was appointed, and before the tax was levied, a written agreement was made between the respondent and the receiver whereby the latter was to have the power, and it was to be his duty, to sell and dispose of the trucks, paying the proceeds thereof to the respondent, and in this instrument it is asserted that the title to the trucks is in the respondent, and will continue to remain in it until the trucks are sold. We are of the opinion, however, that this written agreement cannot have the effect in itself of vesting the absolute title to the trucks in the respondent. When it states the respondent is, and shall continue to be, the owner of the trucks, it probably does nothing more nor less than express the belief or understanding of the respondent and the receiver that the taking of the bill of lading, in the first place, had the effect of transferring the title to the property to the bank. Some of the testimony seems quite conclusively to show that it was not, as a matter of fact,

the understanding that the bank was the owner of the property and that the relationship of debtor and creditor, as between it and the receiver, was terminated. For illustration, the assistant cashier of the respondent testified with reference to this transaction that the bank "made certain loans to Bethlehem Motors Corporation, the advances being made against original drafts with bills of lading attached." Again, that "whatever title they vested in the bank, as a result of the transactions described in answer to question two, might have been, after the receivership the bills of lading were delivered to the receiver of the Bethlehem Motors Corporation upon the understanding that unqualified title to the trucks should be in the bank, so that he might undertake to sell the eight trucks, and to this extent reduce the indebtedness of Bethlehem Motors Corporation to the bank." The receiver testified that the Motors Corporation borrowed money from the respondent upon the drafts in question, and that it was customary for the respondent, if a draft was not paid, to charge the amount back to the Motors Corporation and return to it the bill of lading. He further stated that the title to the trucks was vested in the respondent by delivering the bills of lading "as security for the advances made by the bank."

Having concluded that the bank was not such owner of the trucks as deprived appellant of the right to tax them, it must follow that the judgment must be reversed and the respondent's action be dismissed. It is so ordered.

MAIN, C. J., HOLCOMB, and MITCHELL, JJ., concur.